**L.A. DRAPER & SON,**
**Plaintiff-Appellant,**

v.

**WHEELABRATOR–FRYE, INC., a corporation; Hessco Industrial Supply, Inc., a corporation; Fred Z. Hester, an individual, Defendants-Appellees.**

No. 83–7242.

United States Court of Appeals,
Eleventh Circuit.

June 29, 1984.

Bradley, Arant, Rose & White, Thad G. Long, Joseph B. Mays, Jr., Jere F. White, Jr., Birmingham, Ala., for plaintiff-appellant.

Cabaniss, Johnston, Gardner, Dumas & Oneal, L. Murray Alley, L. Vastine Stabler, Jr., Lee E. Bains, Jr., Birmingham, Ala., for Wheelabrator-Frye and Hessco.

Ralph Gaines, Talladega, Ala., for Hester.

Before JOHNSON and ANDERSON, Circuit Judges, and TUTTLE, Senior Judge.

R. LANIER ANDERSON, III, Circuit Judge:

L.A. Draper & Sons, Inc.[1] (plaintiff in the action below) appeals a directed verdict on its antitrust claim against defendants, Wheelabrator-Frye, Inc. (referred to as "Whiffy")[2], Hessco Industrial Supply, Inc. ("Hessco"), and Fred Hester[3], and the

---

1. Hereinafter referred to as "Ladsco," the division of L.A. Draper & Sons involved in the current action.

2. Employees of Wheelabrator-Frye use this nickname in reference to the company.

3. A fourth co-defendant, Joseph O'Callahan, is the leading officer of Whiffy's materials cleaning division, located in Mishawaka, Indiana. The materials cleaning division manufactures the products involved in this case and O'Callahan was one of Whiffy's principal representatives in the transactions out of which the law-

dismissal without prejudice of its pendent state unfair competition claims.

■ The antitrust claim under Section 1 of the Sherman Act involves a cause of action similar to that discussed in *Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83 (5th Cir.1978), *cert. denied*, 440 U.S. 911 (1979), and *Associated Radio Service Co. v. Page Airways, Inc.*, 624 F.2d 1342 (5th Cir.1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981). Under the principles discussed in *Northwest* and *Page*, a plaintiff establishes an antitrust violation by proving that defendants conspired to use unfair and predatory competitive means to eliminate the plaintiff as a competitor, and that the plaintiff's elimination from the marketplace in this fashion imposed an illegal restraint on trade under the rule of reason analysis. Finding the plaintiff's proof in the instant case insufficient to state a claim under *Northwest* and *Page*, we affirm the district court's directed verdict on the plaintiff's antitrust claims.

With regard to the district court's decision to dismiss the pendent state claims without prejudice, 560 F.Supp. 1138, we remand for a determination of Ladsco's ability to bring those claims in state court. If a state forum is still available for the unfair competition claims, we hold that the district court's dismissal was not an abuse of discretion. If not, we hold that the district court must entertain Ladsco's state claims.

## FACTS

L.A. Draper & Sons, Inc., consists of two divisions, Ladmet and Ladsco, and is wholly owned by its president, Alan Draper. The plaintiff's Ladsco Division has been in the foundry supply business since the early 1950's. In 1979, when this cause of action arose, Ladsco distributed four products: (1) primary and secondary aluminum, (2) refractories, (3) grinding wheels, and (4) abrasive shot.[4] Since 1960 Ladsco has been obtaining that shot exclusively from the corporate defendant, Wheelabrator-Frye. In 1979 it obtained primary aluminum from Alcoa, secondary aluminum from the Ladmet Division of L.A. Draper & Sons, refractories from A.P. Green Refractories, and grinding wheels from Universal Grinding Wheels.

In 1979, the Ladsco Division of L.A. Draper & Sons had for many years been managed by the defendant, Fred Hester, who started with Ladsco in the early 1960's as a clerk typist and worked his way up through the ranks. By the early 1970's, Hester had become a vice president and director of Ladsco and was in charge of its

suit arose. The trial court dismissed the claims against O'Callahan for improper venue. *See* §§ 4 and 12 of the Clayton Act, 15 U.S.C.A. §§ 15 and 22 (1982) (authorizing suits against individuals for violations of the antitrust laws "in the district in which the defendant resides or is found to have an agent"); *Braun v. Berenson*, 432 F.2d 538, 543–44 (5th Cir.1970) (holding that a non-resident officer of the defendant corporation was not "found" in the forum state for purposes of § 4, even though he spent two weeks each year in the forum state on routine corporate business).

Should the district court determine that it must hear Ladsco's state claims pursuant to our instructions on remand, we find that venue was proper against O'Callahan under 28 U.S.C.A. § 1391(b) (1976) ("[a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all the defendants reside, or in which the claim arose, except as otherwise provided by law"). The majority of courts considering the joint operation of the venue provisions of the Clayton Act and § 1391(b) have held that the Clayton Act's specific venue provisions do not "abolish or supersede the available districts mentioned in the general venue provision of § 1391(b)." *First Pullen Commodity Services, Inc. v. A.G. Becker-Kipnis & Co.*, 507 F.Supp. 770, 773 (S.D.Fla.1981) (also providing an exhaustive listing of the courts considering this issue). *See generally*, C. Wright & A. Miller & E. Miller, *Federal Practice & Procedure: Jurisdiction*, § 3818 at 110 (1975). Because the claims in this case arose in the Northern District of Alabama, we consider that venue was properly laid against O'Callahan under § 1391(b) and on remand, if the court entertains the unfair competition claims, it should reinstate him as a party.

**4.** Abrasive shot is a small, rounded steel pellet used in cleaning residue off the molds that foundries use to manufacture various metal products.

day-to-day operations. Ladsco employed five salesmen under Hester's supervision, a warehouse supervisor, and numerous drivers and office personnel.

For some reason, Hester became dissatisfied with his Ladsco employment arrangement. During the summer of 1979 he formed plans to terminate his employment and enter into business in competition with Ladsco. To this end, he purchased a warehouse in Anniston, Alabama, the corporate home of Ladsco, and began obtaining equipment and setting up the warehouse for the foundry supply business. Within a short time, Ned Landers, Jerry Ellis, and Bill West, three of Ladsco's salesmen, had invested in Hester's new venture and made plans to join Hester once the business was started.

By the beginning of August, Hester had informed Ladsco's suppliers of his intent to leave Ladsco and begin a competing business. On July 31 and August 1, 1979, Hester had discussions with Wheelabrator-Frye officials, including the defendant O'Callahan, at Whiffy's offices in Mishawaka, Indiana. Wheelabrator-Frye immediately began to study the Ladsco-Hester situation.

On Thursday, August 23, 1979, Hester resigned. The following Monday, Mr. Draper presented most of the remaining Ladsco employees with an employment contract that included a covenant not to compete, in an effort to determine their continuing loyalty to Ladsco. None of the employees were willing to sign the contract; all were terminated.[5] Within three weeks all but one of the former Ladsco employees had begun to work for Hester's new company in competition with Ladsco.[6]

By the second week of September 1979, Hester's new business, under the name of Hessco, had begun to take orders. Its product lines and suppliers were virtually a mirror image of those Ladsco had offered until two weeks earlier.[7] Mr. Draper, now operating Ladsco himself with a vastly depleted workforce was told by Whiffy that Ladsco no longer had credit to purchase Whiffy shot, but could continue to receive a commission for arranging direct sales to Ladsco customers.

On September 5, Mr. O'Callahan traveled to Anniston and on behalf of Whiffy expressed an interest in purchasing both Ladsco, from Mr. Draper, and Hessco, from Mr. Hester. Hester accepted the offer and on September 20, 1979, Hessco became a wholly-owned subsidiary of Wheelabrator-Frye.

Hessco rapidly became a substantial force in the foundry supply business. It established warehouses in Anniston, Birmingham, and Chattanooga, all cities in which Ladsco maintained warehouse facilities. There is some evidence in the record that Hessco reduced its shot prices in the early months of operation to gain a stronger foothold in the marketplace. Unlike Ladsco, Hessco did not operate in the Carolinas, where Ladsco and Whiffy had for many years been in direct competition for shot sales.

Ladsco, on the other hand, suffered an immediate downturn in its business fortunes. It obtained shot, refractories, and grinding wheels from alternative manufacturers and continued to market foundry supplies in competition with its former employees. Although some customers remained with Ladsco, many customers shifted over to Hessco and its familiar salesmen

---

**5.** Missing from the August 27th meeting was Mr. Bill Ellison, a Ladsco salesman working out of the Birmingham office. Hester and the three salesmen investing in the new venture testified that Ellison had not been approached about the new company because they were convinced of his loyalty to Mr. Draper. Ellison remained with Ladsco following the formation of Hessco.

**6.** The only salesman who left Ladsco and did not join Hessco was Ladsco's salesman in the

Carolinas. Hessco does not sell shot in the Carolinas.

**7.** Ladsco's supplier of primary aluminum, Alcoa, did not become a Hessco supplier until early 1980. Ladsco had been purchasing secondary aluminum from the Ladmet division of L.A. Draper & Sons and continued to do so after Hester and the other employees left.

and products. By the end of 1980, Hessco business reports stated that "Ladsco is selling very little shot."

Based on the foregoing, in the summer of 1980 Ladsco filed suit alleging that Hester and other employees had conspired to use unfair competitive means to eliminate Ladsco from the marketplace. Ladsco further alleged that Whiffy had joined in the conspiracy in an effort to reap the profits that Hessco had attained through its unfair competitive practices. According to Ladsco, the defendant's actions violated § 1 of the Sherman Act and state laws against unfair competition.

After extensive discovery, a jury trial began on March 15, 1982, in the United States District Court for the Northern District of Alabama. After thirteen days of testimony, Ladsco rested. The district court considered motions for directed verdict by Hessco, Hester, and Whiffy on both the antitrust and unfair competition claims. On April 1, the court heard a full day of legal arguments by the parties and announced its intention to file an order granting the directed verdict motions regarding the antitrust claims and dismissing the pendent state claims because they presented novel questions of Alabama law. The jury was dismissed. To allow the plaintiff an opportunity to file a separate state action on the unfair·competition claims, the court proposed to delay in filing its order until April 9, 1982.

The court did not enter its order on April 9, 1982. Rather, for over six months the parties disputed the content of that order and Ladsco filed a motion for a new trial.

On March 8, 1983, the district court had yet to issue its order and Ladsco filed a petition for mandamus. Eight days later the district court entered its order, *L.A. Draper & Son, Inc. v. Wheelabrator-Frye, Inc.*, 560 F.Supp. 1138 (N.D.Ala.1983), and Ladsco filed timely notice of appeal.[8]

## ISSUES ON APPEAL AND STANDARD OF REVIEW

Ladsco presents two primary issues [9] on this appeal: (1) whether the district court properly directed a verdict in favor of the defendants on the antitrust claim, and (2) whether the district court properly dismissed the pendent state unfair competition claims.

With regard to the first issue, the standards for evaluating motions for directed verdict were clearly articulated in *Boeing v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc).[10]

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and

**8.** While pursuing this appeal, Ladsco also filed suit on its unfair competition claims in the Alabama courts. Relying on Ala.Code § 6–5–440 (1975), the state trial court dismissed Ladsco's action because this appeal was pending. The Alabama Supreme Court recently affirmed. The possibility that Ladsco may be unable to reassert its state claims in the Alabama courts is discussed more fully in Section II, *infra.*

**9.** We have already addressed Ladsco's challenge to the dismissal of the defendant O'Callahan for improper venue, *supra* note 3. Ladsco also challenges several of the district court's evidentiary rulings. We have considered the excluded

evidence in determining whether the district court properly dismissed Ladsco's claims. We have determined that Ladsco presented insufficient proof to avoid a directed verdict on the antitrust claims, even considering the excluded evidence, and we therefore do not address the lower court's specific evidentiary rulings.

**10.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Id.* at 374–75 (footnote omitted). *See also Huff v. Standard Life Ins. Co.*, 683 F.2d 1363, 1366 (11th Cir.1982); *Kaye v. Pawnee Const. Co.*, 680 F.2d 1360, 1364 (11th Cir. 1982); *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 848 (5th Cir.1981) (to avoid a directed verdict the plaintiff must present sufficient evidence to create a jury question with respect to each element of its case), *cert. denied*, 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981). In addition, we are mindful of the policy against summary dispositions of antitrust cases "where motive and intent play leading roles, [and] the proof is largely in the hands of the alleged conspirators [and hostile witnesses]," and where the plaintiff must build its case largely on circumstantial evidence. *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

■ The second issue—the dismissal without prejudice of the pendent state claims—is to be judged on an abuse of discretion standard. *See Jackson v. Stinchcomb*, 635 F.2d 462, 473 (5th Cir.1981); *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 248 (5th Cir.1978).

## DISCUSSION

### I. *The Antitrust Issues*

#### A. Generally

Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. Under § 4 of the Clayton Act, "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore ... and shall recover threefold the damages by him sustained." 15 U.S.C. § 15. Ladsco alleges that the defendants conspired to use unfair competitive means to drive Ladsco from the marketplace and seeks treble damages for this alleged violation of § 1 of the Sherman Act.

■ Depending on the claim presented, we evaluate an alleged violation of § 1 under a per se or rule of reason analysis. Certain activities, such as price fixing, have such a pernicious effect on competition and are so lacking in any redeeming virtue that they are deemed per se violations without inquiry into the nature of their impact on a particular market. *See Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (discussing rationale behind per se rule). Other restraints on trade, such as territorial restrictions that a manufacturer imposes on a distributor, have possible procompetitive influences on a given market and the legality of the restraint is judged under the rule of reason. *See, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Under the rule of reason,

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable.

*Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). The rule of reason inquiry must be tied to a particular market in which the challenged activity is alleged to impose an impermissible restraint. *Continental TV., Inc. v. GTE Sylvania, Inc.,* 433 U.S. at 53 n. 21, 97 S.Ct. at 2559 n. 21 ("an antitrust policy divorced from market considerations would lack any objective benchmarks").

In this circuit, we evaluate Ladsco's § 1 claim—that the defendants conspired to use unfair competitive means to drive Ladsco from the market place—under the rule of reason standard discussed in the *Northwest* and *Page* cases.

In *Northwest Power Products, Inc. v. Omark Industries,* 576 F.2d 83 (1978), the Fifth Circuit addressed a claim similar to that presented here. The plaintiff, Northwest, was a former distributor of the defendant manufacturer's product. The defendant, Omark, had allegedly conspired with the plaintiff's key employees to substitute another sales company as its distributor. The new distributor then hired the former Northwest employees. Although Northwest suffered considerable injury as a competitor, the court held that it must further prove that defendant's conduct violated the antitrust laws under a rule of reason analysis.[11] *Accord Associated Radio Service.Co. v. Page Airways, Inc.,* 624 F.2d 1342 (5th Cir.1980) (finding rule of reason violation where defendant conspired with key employees of plaintiff to establish a subsidiary that drove plaintiff out of business).[12]

■ The rule of the *Northwest* and *Page* cases is that "injury to a competitor need not result in injury to competition. The use of unfair means in substituting one competitor for another without more does not violate the antitrust laws." *Manufacturing Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1043 (11th Cir.1982) (citing *Northwest,* 576 F.2d at 90). *See also Redwing Carriers, Inc. v. McKenzie Tank Lines, Inc.,* 594 F.2d 114 (5th Cir. 1979). Unfair competitive means can be actionable under other legal theories, as is demonstrated by Ladsco's pendent state law claims. However, to avail itself of treble damages under § 1 of the Sherman Act, Ladsco must show harm to competition in general, as well as its own injury as a competitor.

Under the *Northwest/Page* analysis, we therefore must evaluate whether, viewing the evidence offered at trial in the light most favorable to the plaintiff, Ladsco offered sufficient proof for a reasonable and fairminded jury to conclude: (1) that the defendants conspired to use unfair competitive means to destroy Ladsco's business, and (2) that the elimination of Ladsco and formation of Hessco imposed an illegal restraint on competition under the rule of reason.

### B. *Rule of Reason Analysis*

■ Without deciding whether Ladsco offered sufficient proof on the conspiracy element of its § 1 claim, we address

---

**11.** In so holding, the *Northwest* court expressly rejected the notion that a conspiracy to use unfair means to destroy a competitor was a per se violation of § 1 of the Sherman Act. *Id.* at 90. Prior to *Northwest,* a line of cases flowing from the First Circuit decision in *Albert Pick-Barth Co. v. Mitchell Woodbury Corp.,* 57 F.2d 96 (1st Cir.), *cert. denied,* 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932), had indicated that a conspiracy to engage in unfair competition was a per se violation of the antitrust laws.

**12.** Following the discussion in *Northwest,* the *Page* court broke the rule of reason test down into two parts, under which the plaintiff must show: "(1) a market effect that would be pro-

hibited under the law of mergers; and (2) other conduct by [the] defendant that threatens Sherman Act values." 624 F.2d at 1351. Three findings were relevant to the *Page* Court's determination that the defendant had violated the rule of reason: (1) Associated was the most significant competitor in a concentrated market; (2) Page was a potential entrant into the market and its entry by taking over the business of the most significant competitor held potential for lessening competition; and (3) the newly created subsidiary had dramatic market power as was evidenced by its ability to raise prices and make excessive profits on its installation contracts. *Id.* at 1351–53.

the more fundamental inadequacy in the proof offered at trial. To avoid a directed verdict on its antitrust claims, Ladsco had to introduce sufficient evidence to create a jury question on each element of its claim. *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 848 (5th Cir.1981). We must agree with the district court's determination that Ladsco offered insufficient proof of the relevant geographic market in which the defendant's actions allegedly restrained trade. 560 F.Supp. at 1144.[13]

1. The necessity of showing a relevant market

In order to prevail on a claim under the *Northwest/Page* analysis, Ladsco bore the burden of showing an injury to competition. To show such an injury, Ladsco first had to establish a particularized or relevant market in which the defendant's actions unreasonably restrained trade. In *Dougherty v. Continental Oil Co.*, 579 F.2d 954 (5th Cir.1978), *vacated by stipulation of the parties*, 591 F.2d at 1206 (1979), the court stated:

**13.** At oral argument to this court, Ladsco contended for the first time that it had introduced sufficient evidence on each of three per se theories to avoid a directed verdict on the antitrust claims. These theories—(1) resale price maintenance, (2) tying arrangements, and (3) group boycott—were not included in Ladsco's complaint nor were they part of the amended pretrial order in the case. Ladsco's failure to assert its per se theories of recovery prior to oral argument before this court would generally preclude their consideration at this time. Furthermore, the district court did address these claims in the fashion in which Ladsco presented them below and in its briefs to this court. Ladsco had argued that these three factors contributed to a finding of "a threat to antitrust values" under the second prong of the *Northwest/Page* analysis. *See supra* note 12. Viewed in this context, the district court properly held that there was insufficient proof on these theories to constitute a "threat" to antitrust values, let alone a per se violation of the antitrust laws. 560 F.Supp. at 1140–44.

Ladsco also argued that Whiffy was guilty of imposing territorial restrictions on Ladsco as a distributor. The district court found this allegation lacking in any factual basis. 560 F.Supp. at 1142–43. In addition, territorial restrictions are judged under the rule of reason. *Continental*

An antitrust plaintiff thus makes out a prima facie case under the rule of reason only upon "proof of a well-defined relevant market upon which the challenged anticompetitive actions would have substantial impact."

*Id.* at 962 (quoting *Cornwell Quality Tools Co. v. CTS Co.*, 446 F.2d 825 (9th Cir.1971), *cert. denied*, 404 U.S. 1049, 92 S.Ct. 715, 30 L.Ed.2d 740 (1972)). *See also Graphic Prods. Distribs., Inc. v. Itek Corp.*, 717 F.2d 1560, 1569 (11th Cir.1983) (analyzing anticompetitive effect of territorial dealer restrictions under rule of reason); *Hornsby Oil Co. v. Champion Sparkplug Co.*, 714 F.2d 1384, 1393 & n. 8 (5th Cir.1983) (same). Evaluations of the market power of the parties involved and the anticompetitive effect of an alleged restraint, both of which are essential to the rule of reason analysis, are rendered impossible in the absence of proof regarding the economic significance (or relevance) of the market allegedly influenced by the defendant's conduct. *See Dougherty v. Continental Oil Co.*, 579 F.2d at 962; *Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d at 87.[14]

*T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Thus, just as Ladsco's failure to establish a relevant market defeated its claim under *Northwest* and *Page*, absence of proof on the relevant market defeated the territorial restrictions allegation as well.

**14.** The importance of the relevant market determination to a rule of reason analysis is illustrated by the Supreme Court decision in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). *Tampa Electric* was a case under § 3 of the Clayton Act and involved a requirement contract between the parties. The coal company defended its breach of that contract on grounds that the contract violated the antitrust laws because it imposed an illegal restraint on trade. Had the Court adopted the defendant's argument that the relevant geographic market consisted of Peninsular Florida, the contract at issue would have foreclosed 18% of the market. By broadening the relevant market to include those areas "to which the purchaser[s] [could] practicably turn for supplies," *id.* at 327, 81 S.Ct. at 628, 5 L.Ed.2d at 587, the market foreclosure dropped to less than 1%.

In the instant case, without proof of a relevant market, there was no way for the jury to find a market effect that would be prohibited by

## 2. Defining a relevant market

The relevant market is defined generally as "the area of effective competition." *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). The market must contain both a product dimension (determined by the availability of substitutes to which consumers can turn in response to price increases and other existing or potential producer's ability to expand output), and a geographic dimension (the area in which the product or its reasonably interchangeable substitutes are traded), both of which must be shown to be economically significant. *Id.* at 324–26, 82 S.Ct. at 1523–25; *Hornsby Oil Co. v. Champion Sparkplug Co.*, 714 F.2d at 1393. Within a broad market, economically significant submarkets can exist that in themselves constitute relevant markets. *Brown Shoe Co. v. United States*, 370 U.S. at 325 & 336–37, 82 S.Ct. at 1523 & 1529–30 ("thus, although the geographic market in some instances may encompass the entire nation, under other circumstances it may be as small as a single metropolitan area").

Assuming *arguendo* that retail shot sales constituted a relevant product for which there are no readily apparent substitutes, the defendants argue and the district court found that Ladsco offered insufficient proof to create a jury question on the relevant geographic boundaries of the shot market. We agree.

In determining the "area of effective competition" in which a product or its reasonably interchangeable substitutes are traded, "such economic and physical barriers to expansion as transportation costs, delivery limitations and customer convenience and preference must be considered." *Hornsby Oil Co. v. Champion Sparkplug Co.*, 714 F.2d at 1394. The location and facilities of other producers and distributors are also essential in determining the relevant geographic market. *See Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L.Ed.2d

580 (1961). Economically significant geographic barriers limit the ability of sellers outside the market to operate within, and the ability of purchasers to obtain the product from suppliers outside the geographic area. *Id.* Price data, corroborated by the factors listed above, are perhaps the most probative evidence on the relevance of the given market.

> If sellers within the area are making price and output decisions protected from the need to take account of sellers outside the area, there is the distinct [geographic] market. If sellers within the market must take account of sellers outside it, either because those sellers are mobile and can easily come into the area to sell, or because buyers are mobile and can easily go outside the area to buy, the market is being defined too narrowly.

L. Sullivan, *Handbook of the Law of Antitrust*, § 19 at 68 (1977). *See also* II P. Areeda & D. Turner, *Antitrust Law*, ¶ 522 at 355 ("[w]hen prices and price movements in two territories are closely corrollated, a single market definition is strongly indicated").

## 3. Analyzing Ladsco's Proof

Ladsco has attempted to define two distinct geographic areas as relevant shot markets. Viewing Ladsco's evidence in a favorable light, as we must on review of a directed verdict, we address each proposed market and conclude that the proof was insufficient to support a jury finding that either market was economically significant.

### a. The Four State Area

The first of the markets Ladsco identifies as relevant is the four-state area consisting of Alabama, Tennessee, Georgia, and Mississippi. This is an area in which Ladsco had for twenty years served as the exclusive distributor of Whiffy shot and had captured 50% of the shot sales. Hessco now fulfills a similar function and has about the same market share. Ladsco also offered proof that would support an infer-

---

the merger laws. Therefore, Ladsco could not meet its burden of proof under the first prong

of the *Northwest/Page* analysis. *See supra* note 12.

ence that consumers in the four-state area were loyal to the salesmen formerly employed by Ladsco and now working for Hessco, and preferred local warehousing for quick delivery—a factor also indicated by Hessco's establishment of local warehouses and operations identical to those used by Ladsco. Finally, Ladsco introduced evidence that shot is a heavy, low-cost item, where freight cost is a significant marketing consideration.

Notably absent from the record is any showing on how the four-state area functioned as a distinct or relevant geographic market. Ladsco offered no evidence on the location of shot manufacturers other than Whiffy and the ability of those manufacturers to sell in the four-state area. *Compare Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. at 331, 81 S.Ct. at 630 (area of effective competition is area in which coal producers operated and were willing to compete for customers). Ladsco competed in the four-state area with eight to ten other distributors, but there is no evidence in the record on where those distributors obtained shot, sold shot (*i.e.*, we do not know the sales patterns of Ladsco's competitors; they may sell shot outside the four-state area), or where their warehouse facilities were located. Most importantly, Ladsco offered no evidence on the relationship of prices within the four-state area to other parts of the country. There was simply no evidence that could support an inference that if prices increased in the four-state area, purchasers could not obtain shot from distributors located elsewhere. *Compare, id.* at 327, 81 S.Ct. at 628 (in order to find a market relevant, purchasers must, as a practical matter, be unable to turn to suppliers outside their own area); L. Sullivan, *supra* § 19 at 68.

Ladsco did show that it, and Hessco, adopted the four-state area as their sales area. However, as noted, there was no evidence that competing distributors used a similar sales pattern. Furthermore, any number of irrelevant considerations could have caused Ladsco and Hessco to limit their operation to a four-state area. For example, both Ladsco and Hessco sell a mix of several different foundry supplies. The geographic market limitations and consumer preferences that led to Ladsco and Hessco's four-state distribution pattern could have been created by any one of the products, or some mix of all four. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 360–61, 83 S.Ct. 1715, 1739–40, 10 L.Ed.2d 915 (1963) (recognizing that banks, which offer a variety of services to a variety of customers, may face an "area of effective competition" that varies according to the service and customers). We are concerned here only with the geographic market for shot sales; and Ladsco's proof that it and Hessco served a four-state area with sales of various foundry supplies, unsupported by a showing that other shot sellers followed a similar sales pattern, is inconclusive on the sales pattern that prevailed in the shot market.

■ Even if Ladsco had shown that the four-state area was the predominant sales pattern for shot sales, that evidence without more would have been insufficient to present the issue to the jury. "Although actual sales patterns can aid in the interpretation of ambiguous price data or otherwise illuminate the character of the market, we should be aware that actual patterns can also be virtually meaningless." II P. Areeda & D. Turner, *supra* ¶ 522(b) at 357. The pattern of sales may only reflect established consumer preferences, but do not mean the customers would remain loyal if Ladsco or now Hessco would try to raise shot prices. For proof of sales patterns to support a geographic market definition, we would have to know that consumers could not realistically turn to outside distributors should prices rise within the four-state area. *Id. See also Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. at 327, 81 S.Ct. at 628; *RCM Supply Co. v. Hunter Douglas, Inc.*, 686 F.2d 1074 (4th Cir.1982) (plaintiff's proof that it sold only in metropolitan Washington, D.C. area was inconclusive on geographic market issue, in face of evidence that suppliers outside the market could and did make shipments into the area).

Ladsco also offered evidence that consumers were loyal to familiar salesmen and distributors that maintained local warehousing for quick and reliable services. This evidence, in conjunction with proof of price differentials between the four-state area and other portions of the country, might have created a jury issue on the four-state area as a relevant market. *See Brown Shoe Co. v. United States*, 370 U.S. at 325, 82 S.Ct. at 1524 (practical indicia, such as consumer preference, can aid in defining an economically significant markets); II P. Areeda and D. Turner, *supra* ¶ 524 at 367 & 370 ("consumer convenience and preference ... can narrow the scope of a geographic market * * * [however], we are inclined to view the identification of such barriers to entry as consumer preferences or the need for local sales or servicing facilities as serving no useful purpose other than to support price relationship data that point to separate markets").

The record in the instant case, however, is insufficient to afford any weight to Ladsco's proof of consumer preference as it relates to relevant market definition. Ladsco, which bore the burden of proving that it had identified an economically significant market, had to show how the alleged consumer preferences translated into market power for the firms within the four-state area and contributed to making that area a relevant market. Crucial information on the location of distribution facilities, the availability or nonavailability of shot at competitive prices from outside the four-state area, and the existence of price differentials is lacking. Ladsco's evidence on consumer preferences was therefore inconclusive and insufficient to create a question for the jury.

Finally, Ladsco's evidence on freight costs also was insufficient to create a jury question. Areeda & Turner state: "Two areas are ordinarily separate markets where there are no or only episodic sales between them and where transport costs exceed any price differentials between the two areas." II. P. Areeda & D. Turner, *supra* ¶ 523 at 358. *See also Hornsby Oil Co. v. Champion Sparkplug Co.*, 714 F.2d at 1393 (transport costs factor in determining relevant market); *United States v. Columbia Steel*, 334 U.S. 495, 510–11, 68 S.Ct. 1107, 1115–16, 92 L.Ed. 1533 (1947) (same). Transport costs, however, must be compared in order to support a given market definition. Ladsco had to present sufficient evidence for the factfinder to conclude that these costs foreclosed the market to shot suppliers outside the geographic area. *Id.*

In the instant case, Ladsco showed that transport costs into the four-state area from Whiffy's Virginia plant were a significant portion of the sales price of shot (15%). It failed to offer any proof on how Ladsco's cost related to other distributors or suppliers operating within or outside the four-state area. Because there was no proof of price differentials between the four-state area and other places where shot was sold, there was no indication that relative transport costs exceeded those differentials. Proof of the mere existence of significant transport costs from one plant into the four-state area could not support a conclusion that the four states were an economically significant, distinct, relevant market.

In short, the record is devoid of sufficient evidence on the operation of the four-state area as a relevant market to create a legitimate question of fact for the jury.

b. The Carolinas

Ladsco also asserted that North and South Carolina were a second relevant market in which the alleged Whiffy-Hessco conspiracy imposed an unreasonable restraint on trade. This is an area in which Ladsco and Whiffy had competed directly for shot sales.[15] As with regard to the

15. Contrary to Ladsco's assertion, the mere fact that it competed with Whiffy in the Carolinas is insufficient to establish the Carolinas as a relevant market. In support of its assertion, Ladsco cites the general proposition that a relevant market is the "area of effective competition." *E.g., Brown Shoe Co. v. United States*, 370 U.S. at 324, 82 S.Ct. at 1523. However, the concept

four-state area, Ladsco introduced no proof on the location of manufacturers and distributors competing for shot sales in the Carolinas. There was no evidence on the relationship of prices in the Carolinas to other areas.[16]

For the reasons discussed with respect to the four-state area, we conclude that Ladsco did not offer sufficient proof to create a jury question on the definition of the Carolinas as a relevant market.

In affirming the district court's directed verdict on the antitrust claims, we are mindful of the principle that relevant market definition is generally a question of fact for the jury. *See Heatransfer Corp. v. Volkswagenwerk, A.G.,* 553 F.2d 964, 979–81 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). We are also aware that the definition of a relevant market should be pragmatic, not formal or legalistic. *Brown Shoe Co. v. United States,* 370 U.S. at 336–37, 82 S.Ct. at 1529–30. Nevertheless, we conclude that Ladsco failed to present sufficient evidence of the commercial realities within the industry to warrant a jury finding that either the four-state area or the Carolinas constitute an economically significant relevant market.

Without a well-defined relevant market upon which the defendant's alleged anticompetitive conduct might be judged, there was simply no way for the jury to conduct the rule of reason analysis required in this case. Accordingly, we must affirm the district court's directed verdict on the antitrust claims.

## II. DISMISSAL OF THE PENDENT STATE LAW CLAIMS FOR UNFAIR COMPETITION

 With regard to the district court's dismissal without prejudice of Ladsco's pendent state unfair competition claims, we must remand to the district court for reconsideration in light of recent developments in the state court action that Ladsco filed subsequent to the district court's final order in this case. *See supra* note 8. The district court's decision to dismiss the pendent state claims was based in large part on Ladsco's ability to obtain a state forum for its unfair competition claims. Ladsco filed the state action; and the Alabama Supreme Court recently affirmed the state trial court's dismissal of that action because this federal appeal was pending. *L.A. Draper & Sons, Inc. v. Wheelabrator-Frye, Inc.,* 454 So.2d 506 (Ala.1984).[17]

The parties' briefs to this court have not addressed the issue of whether a state action remains available to Ladsco on its unfair competition claims. Accordingly, we remand to the district court to determine that issue, which, as we will discuss, has a decisive bearing in this particular case on the propriety of denying Ladsco a federal forum for its pendent state claims. *See Pharo v. Smith,* 625 F.2d 1226, 1227 (5th

---

of effective competition in *Brown Shoe* and other cases that Ladsco cites is not limited to the parties in a given case, but encompasses the area in which suppliers of the product can effectively compete and purchasers can turn for supplies. *See, e.g., Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. at 327, 81 S.Ct. at 628 (discussing "area of effective competition").

**16.** Indeed, the record indicates that prices in the Carolinas were similar to those in the four-state area. Whiffy supplied shot for the Carolinas and the four-state area from its Virginia plant. If anything, the record supports an inference that the Carolinas and the four states were part of a single market. Even combining these areas, however, there was insufficient proof to support a relevant market definition.

**17.** The state courts dismissed Ladsco's claim on the authority of Ala.Code § 6–5–440 (1975), which provides:

No plaintiff is entitled to prosecute two actions in the courts of this state at the same time for the same cause and against the same party. In such a case, the defendant may require the plaintiff to elect which he will prosecute, if commenced simultaneously, and the pendency of the former is a good defense to the latter if commenced at different times. The Alabama Supreme Court interpreted the statute to preclude a state action while Ladsco's federal appeal on the same claim was pending. That court, however, did not address the issue of whether a state forum would be available to Ladsco following the conclusion of a federal action in which the merits of the state claim were not addressed.

Cir.1980) (remanding to district court to redetermine whether pendent state claims should have been dismissed in light of possible statute of limitations bar to subsequent state suit).

A. *The State Law Claims Were Pendent Under the United Mine Workers v. Gibbs Analysis*

■ Two factors determine whether state law claims lacking an independent federal jurisdictional basis can be heard in federal court with a federal claim over which the court has jurisdiction. To exercise pendent jurisdiction over state law claims not otherwise cognizable in federal court, "the court must have jurisdiction over a substantial federal claim and the federal and state claims must derive from a 'common nucleus of operative fact.'" *Jackson v. Stinchcomb*, 635 F.2d 462, 470 (5th Cir.1981) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). *See generally* C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3567 pp. 443–47 (1975).

■ For jurisdictional purposes, Ladsco's antitrust claim was sufficiently substantial. "The question for jurisdictional purposes is 'not whether the claims are without merit but whether the prior decisions inescapably render the claims frivolous.'" *Jackson v. Stinchcomb*, 635 F.2d at 471 (quoting *Curtis v. Taylor*, 625 F.2d 645, 649–50 (5th Cir.1980)). The federal courts' power or jurisdiction to entertain pendent state claims ordinarily is determined on the pleadings. *United Mine Workers v. Gibbs*, 373 U.S. at 727–28, 86 S.Ct. at 1139–40. Although Ladsco's proof on the federal claims ultimately was insufficient to create an issue for the jury, the claims at the pleading stage did state a cause of action similar to that recognized in *Northwest* and *Page*. Thus, the antitrust claims were not inescapably rendered frivolous by previous decisions. *See Warehouse Groceries Management v. Sav-U-Warehouse*, 624 F.2d 655, 659 (5th Cir. 1980) (dismissal of federal claims does not

necessarily keep those claims from being "substantial" for purposes of jurisdiction over pendent state law claims).

In addition, Ladsco's state law unfair competition and federal antitrust claims derived from a "common nucleus of operative facts." *Jackson v. Stinchcomb*, 635 F.2d at 470. The actions of Hester and the three salesmen, along with the alleged conspiracy in which Whiffy participated, were the basis for both the federal and state claims. Considered without regard to their federal or state character, Ladsco's antitrust and unfair competition claims are such that they ordinarily would be tried in a single action. *See United Mine Workers v. Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138.

■ Because the federal claim was substantial, and the state claims arose from the same facts, the district court had the power to hear the pendent state claims. Subsequent developments, including the directed verdict against the federal antitrust claims, have not divested the district court's jurisdiction should the court determine on remand that a state forum is unavailable and that it must hear the pendent unfair competition claims. *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982) ("federal court may retain pendent jurisdiction over a state claim which is barred by the state period of limitations, even though all federal claims have been dismissed").

B. *The Discretionary Factors*

■ The Court in *Gibbs* held that even where the federal court has power to entertain the pendent state claims, it need not do so: "[P]endent jurisdiction is a matter of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. *See also Laird v. Bd. of Trustees of the Inst. of Higher Learning of the State of Mississippi*, 721 F.2d 529, 534 (5th Cir.1983); *Jackson v. Stinchcomb*, 635 F.2d at 472. The discretion to entertain or dismiss the pendent state claims continues throughout the proceeding. *See United Mine Workers v. Gibbs*, 383 U.S. at 727, 86 S.Ct. at 1139; *H & B Equipment*

*Co. v. International Harvestor Co.*, 577 F.2d 239, 248 (5th Cir.1978) (holding that dismissal of pendent state unfair competition claims was not an abuse of discretion subsequent to trial that resulted in directed verdict against plaintiff's antitrust claims). *See generally*, C. Wright, A. Miller & E. Cooper, *supra*, § 3567 at 445.

■■■ The district court's discretionary decision whether or not to entertain pendent state claims is guided generally by four factors: (1) whether the state law claims predominate in terms of proof, the scope of the issues raised, or the comprehensiveness of the remedy sought; (2) whether comity considerations warrant determination by a state court (*i.e.*, is the state claim novel or particularly complex such that an accurate definitive interpretation of state law is necessary); (3) whether judicial economy, convenience, and fairness to the litigants would best be served by trying the federal and state claims together; and (4) whether "the state claim is so closely tied to questions of federal policy that the argument for exercise of pendent jurisdiction is particularly strong." *Jackson v. Stinchcomb*, 635 F.2d at 473 (quoting *United Mine Workers v. Gibbs*, 383 U.S. at 726–27, 86 S.Ct. at 1139–40).

The timing of the federal court's decision to hear the state claims also influences the consideration of these discretionary factors. For example, a state claim that does not appear predominant on the pleadings may emerge as such following discovery. Thus, a district court might properly find that the first factor warrants dismissal of the state claim sometime after the pleading stage. *See Jackson v. Stinchcomb*, 635 F.2d at 472 n. 20. Indeed, if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the state claims. *United Mine Workers v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. *See Joiner v. Diamond M. Drilling Co.*, 677 F.2d 1035, 1042 (5th Cir.1982); *Ray v. Tennessee Valley Authority*, 677 F.2d 818, 825 (11th Cir.), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 994 (1983). Conversely, after a full trial on the

merits, judicial economy and convenience counsel against dismissal of the state claims, which would thereby require an identical and duplicative proceeding in state court. *See Caserta v. Village of Dickinson*, 672 F.2d 431, 433 (5th Cir.1982). If the statute of limitations had run on Ladsco's state claims while the action in federal court was pending, previous decisions of this court strongly indicate that dismissal of the state claims would be an abuse of discretion. *Ransom v. S & S Food Center, Inc.*, 700 F.2d 670, 678 (11th Cir.1983); *Stein v. Reynolds Securities, Inc.*, 667 F.2d at 34; *Rheaume v. Texas Dept. of Public Safety*, 666 F.2d 925, 931–32 (5th Cir.), *cert. denied*, 458 U.S. 1106, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982); *Henson v. Columbus Bank & Trust Co.*, 651 F.2d 320, 325 (5th Cir.1981); *Pharo v. Smith*, 625 F.2d 1226, 1227 (5th Cir.1980). *See also Quality Foods de Cent. Am. v. Latin Am. Agribusiness Dev. Corp.*, 711 F.2d 989, 990–91 (11th Cir.1983) (remanding for consideration of statute of limitations problem in dismissal of pendent claims, but noting that issue was not presented to district court and that delay causing statute of limitations problem was caused by plaintiff).

In examining the factors that guided the district court's determination to dismiss the pendent claims, we first assume that a state forum is still available to Ladsco on its unfair competition claims and find the decision was not an abuse of discretion. In the following section, we determine that if Ladsco's action in the state courts is now unavailable, the balance of discretionary factors tips in favor of the district court affording Ladsco a decision on the merits of its state claims, which were properly appended to a non-frivolous federal action.

1. Assuming a State Forum is Still Available

■■■ Once the district court had directed a verdict against the antitrust claims, it had only the state claims left to consider; as would of course be true in any case in which the federal claims are insufficient to

create a jury issue. This predominance of the state claim, by itself, is not determinative; the federal claims can drop out of the case after trial yet dismissal of pendent state claims nevertheless might be an abuse of discretion. *See Caserta v. Village of Dickinson,* 672 F.2d at 433 (holding that district court properly dismissed federal claims after trial, but abused discretion in dismissing pendent state claims).

The district court relied primarily upon the second factor, the novelty of the state unfair competition allegations, as grounds for dismissing the pendent claims.

> [C]omity requires that this court defer to the courts of Alabama for a ruling on the alleged unfair competition claim. That claim, as alleged in the complaint, has never been recognized by the Alabama courts. A preliminary search for Alabama authority has revealed a single case on the general issue, with facts quite dissimilar from the facts here. Thus, what is helpful in that opinion is, for the most part, mere dictum.

> \* \* \* \* \* \*

> It is most improper for a federal court, without suitable law to guide it, to plow new ground in a state law field.

560 F.Supp. at 1146. We agree with the district court and the weight it placed upon this factor. *See Financial General Bankshares, Inc. v. Metzger,* 680 F.2d 768, 776 (D.C.Cir.1982) ("[a]lthough the degree of uncertainty in state law is one of several factors that should guide the district court's discretion, it should be given considerable weight"); *Gregory v. Mitchell,* 634 F.2d 199, 202 (5th Cir.1981).[18]

The legal ramifications of Hester and the three salesmen forming a competing business while in Ladsco's employ, and Whiffy's possible conspiratorial participation are by no means clear in Alabama law. Any decision on the parameters of the state law claim, if indeed one exists, should be rendered, if possible, by the Alabama courts. The district court's reliance on this important factor favoring dismissal of the pendent state claims was not misplaced.

At the time the district court rendered its decision on the state claims, considerations of judicial economy and convenience weighed against dismissal. The same witnesses would have to introduce virtually identical testimony in a duplicative state proceeding. *See Phillips v. Smalley Maintenance Services, Inc.,* 711 F.2d 1524, 1531 (11th Cir.1983) (affirming district court's decision to exercise pendent jurisdiction over state claims, which avoided the necessity of dual proceedings in federal and state court and the need for witnesses to testify twice to the same facts). The dismissal of the state claims imposed a waste of judicial time and resources in the instant case.

However, in the district court's discretion, the convenience and economy considerations did not outweigh the novelty factor which favored dismissal of the state claims so that they might be determined by the Alabama courts. In this vein, we note that the district court made commendable efforts to ensure that a state forum was available for Ladsco's claims and to ameliorate any unfairness to Ladsco that might result from dismissal of the state claims. The court's order dismissing the pendent claims without prejudice was contingent

18. Professor Wechsler articulated the rationale underlying this factor of the *Gibbs* decision as follows: "[F]ederal courts are not the authorized expositors of state law; there is no mechanism by which their errors in such matters can be corrected on appeal by state courts." Wechsler, *Federal Jurisdiction and the Revision of the Judicial Code,* 13 LAW & CONTEMP.PROB. 216, 232 (1948) (cited in *Gibbs,* 383 U.S. at 726 n. 15, 86 S.Ct. at 1139 n. 15). *See also* Note, *UMW v. Gibbs and Pendent Jurisdiction,* 81 HARV.L. REV. 657, 666 (1968) ("A federal court's holding on a novel issue of state law may unduly limit

later state consideration of the problem; a state court will be hesitant to create a conflict with the federal determination because of possible reliance upon that earlier exposition.")

The district court found that certification of the general question regarding the parameters of Ladsco's state claims would not be efficient or appropriate. 560 F.2d at 1146. However, should the court on remand determine that it must hear the state claims, it should consider whether it is feasible to narrow the state law questions sufficiently to certify specific questions to the Alabama Supreme Court.

upon securing from defendants a waiver of any portion of the statute of limitations that ran from the time Ladsco filed the federal action to the final order by the district court. *See Stein v. Reynolds Securities, Inc.*, 667 F.2d at 34; *Henson v. Columbus Bank & Trust Co.*, 651 F.2d at 325 (abuse of discretion to dismiss time-barred pendent state claims); *Pharo v. Smith*, 625 F.2d at 1227 ("[t]hat a plaintiff's state law claims will be time-barred if dismissed is certainly a factor, if not a determinative factor, a district court should consider in deciding whether to maintain jurisdiction over pendent state claims once the federal claims have been resolved").[19]

If the district court was correct assuming that Ladsco could obtain a state forum for its novel state claims, we conclude that the dismissal was not an abuse of discretion.

### 2. If a State Action is Not Available

The district court evidenced sensitivity to the potential unfairness of its dismissal in the stipulation it obtained from defendants on the statute of limitations question. However, the court, while avoiding the

statute of limitations problem, failed to account fully for the procedural bar of Ala. Code § 6–5–440 (1975) (discussed *supra* at note 17).[20] That provision forces a plaintiff to elect prosecution in a single forum; and, as applied on the instant facts, led to dismissal of Ladsco's state court claims because this appeal was pending.

Because the parties have not briefed the issue, we do not know whether Ladsco could reassert its state claims in the Alabama courts. If not, then the Alabama statute operated on these facts much like a statute of limitations in depriving Ladsco of a state forum because it chose to bring its state claims, which were properly pendent to the antitrust claims, in a single action in federal court. By analogy to the cases involving a statute of limitations bar to a subsequent state proceeding,[21] we conclude that Ladsco's inability to obtain a state forum for its claims would render the district court's dismissal of the pendent claims an abuse of discretion.[22]

### CONCLUSION

After examining the factors considered by the district court, we affirm its dismiss-

---

**19.** With regard to the fourth factor, the pendent state law unfair competition claims were not so closely tied to federal policy as to warrant a federal forum for the state claims. *Compare Jackson v. Stinchcomb*, 635 F.2d at 473 (state law claims for wrongful discharge were pendent to federal claim under 42 U.S.C. § 1983 and involved important questions of federal policy that favored litigation in a federal forum). This factor thus does not point to an abuse of discretion in the district court's dismissal of the state claims.

**20.** The district court's failure to account fully for the procedural bar in Ala.Code § 6–5–440 is understandable in light of then-existing interpretations of that section. In *Terrell v. City of Bessemer*, 406 So.2d 337 (Ala.1981), the Alabama Supreme Court held that the section did not apply to prevent a state action if the federal court dismissed pendent state claims. The Alabama court did not clarify *Terrell*, or the operation of the statute when a federal appeal was pending, until Ladsco filed its state claim.

**21.** The instant case is distinguishable from *Quality Foods de Central America v. Latin American Agribusiness Development Corp.*, 711 F.2d 989 (11th Cir.1983). In *Quality Foods*, the court

"reluctantly" remanded to the district court for reconsideration of its dismissal of pendent state claims in light of a possible statute of limitations bar. *Id.* at 990–91. The court intimated that even if the district court found that the state claims were time-barred, it nevertheless might dismiss the pendent claims because the statute of limitations issue was not presented to the district court during its initial consideration of the pendent claims and any delay in the federal proceedings that may have led to the limitations problem was caused by the plaintiff's recalcitrance. Conversely, Ladsco argued to the district court prior to dismissal of the pendent claims that the Alabama courts would not consider its state claims should Ladsco pursue its right to appeal the district court's order.

**22.** We place dispositive weight on the availability of a state court action in analyzing the dismissal of the pendent claims, because the dismissal, even without the unavailability of a state court action, was an extremely close question. If a state court action is not available, it would be an abuse of discretion to dismiss the pendent claims. *See Henson v. Columbus Bank & Trust Co.*, *supra* (holding that district court abused its discretion in dismissing pendent claim on facts similar to but weaker than the instant facts).

al of Ladsco's state claims contingent upon a finding on remand that Ladsco can obtain a state forum for its claims. Although that dismissal was contrary to notions of economy and convenience, the novelty of the state claims was such that comity considerations strongly favor dismissal. We cannot say that the district court abused its discretion in determining that the need for a "surer-footed" rendering of state law weighed heavily enough to favor dismissal.

Conversely, should the district court determine on remand that Ladsco is unable to bring its unfair competition claims in the Alabama courts, the district court's dismissal would be extremely unfair to Ladsco. The court properly attempted to remove the unfairness of a statute of limitations bar, evidencing its sensitivity to the potential hardship caused by dismissal of the pendent claims, but understandably failed to account fully for the similar hardship imposed by Ala.Code § 6–5–440. The district court's discretion to dismiss pendent state claims should not work a hardship on Ladsco, simply because it elected a federal forum and chose to appeal its substantial federal and state claims to this court. The district court has jurisdiction over the pendent claims and should exercise that jurisdiction if an alternative forum is unavailable. *See Stein v. Reynolds Securities, Inc.*, 667 F.2d at 34; *Henson v. Columbus Bank & Trust Co.*, 651 F.2d at 325; *Pharo v. Smith*, 625 F.2d at 1227. *Cf. Jackson v. Stinchcomb*, 635 F.2d at 472 (power to hear pendent claims ordinarily exercised).

The directed verdict against the antitrust claims is AFFIRMED. The dismissal with prejudice of the pendent state unfair competition claims is REMANDED WITH INSTRUCTIONS.