**Mark J. DRISCOLL and Sylvia Driscoll, Plaintiffs,**

v.

**Barry L. SCHUTTLER, et al., Defendants.**

**No. 1:85–CIV–4615–RHH.**

United States District Court, N.D. Georgia, Atlanta Division.

May 11, 1988.

Michael W. Higgins, Higgins & Dubner, Atlanta, Ga., for plaintiffs.

Robert D. Feagin, III, James R. McGuone, Dinah Leigh, Hamilton, Gambrell, Clarke Anderson & Stolz, Atlanta, Ga., for defendants.

## ORDER

ROBERT H. HALL, District Judge.

This case is currently before the court on Defendants' motions for summary judgment.

## FACTS

Plaintiffs are residents of Maryland and Virginia who invested in herds of cattle offered by Lovana Farms, Inc. Defendants are Financial Service Corporation and FSC Securities Corp. ("FSC") (the underwriters), Barry L. Schuttler (the registered representative), Andrews Davis Legg Bixler Milsten & Murrah, P.C. ("Andrews Davis") (the Lovells' and Lovana's attorneys), Joseph G. Shannonhouse, IV ("Shannonhouse") (a partner and shareholder in Andrews Davis), Lovell Cattle Company (the company that sold the animals to Lovana Farms which in turn were sold to Plaintiffs), Virgil Lovell (the President of Lovana Farms), Fred and Carlos Lovell (the partners who own Lovell Cattle Company) and Lovana Farms, Inc. (which sold the animals to plaintiffs).

In connection with their Lovana Farms investments, Plaintiffs made cash payments over three years and signed promissory notes for the balance of the purchase price of their herds of cattle. Plaintiffs also entered into management agreements with Lovana Farms, Inc., the sponsor of the investments, whereby they agreed to pay for Lovana's services in managing and maintaining the herds. Under the management agreement, plaintiffs were required to pay additional cash in annual installments during the first three years of the programs. In exchange, Lovana was obligated to breed and manage the herds, with the goal of earning investors profits from the long-term increase in herd size and quality.

The cattle management agreements obligated Lovana to breed and maintain the plaintiffs' cattle for the 9 or 10 year duration of the program. The agreement also empowered Lovana to sell cattle and make other decisions regarding the maintenance of the herds. In exchange, the investors were obligated to pay Lovana Farms a management fee in the amount of $650 per head for the first year, $325 per head for the next four six-month periods, and the greater of $337.50 per head or an amount computed under an agricultural index for all remaining six-month periods. Excess maintenance fee payments and the proceeds of sales of the investors' cattle were to be credited under the maintenance agreement to an investor reserve account and applied to future maintenance fees and interest on the notes. The offering materials projected that cattle sales throughout the years would be sufficient to pay the maintenance fees for the remainder of the program, pay the notes, and return a profit to the investors. If, however, at any time during the program the maintenance reserve was exhausted, the maintenance agreement permitted Lovana to ask plaintiffs to advance additional funds as set forth in the agreement, but plaintiffs had no personal liability to pay additional maintenance fees to Lovana.

In connection with their decision to invest in a Lovana Farms' herd, each plaintiff was to receive a Private Placement memorandum or prospectus and a Projected Model of Operations which included

Notes and Assumptions or projections which projected the number of offspring to be born each year, and the amount of income to generated from the sale of those offspring in each year. Also indicated in the projections was the average price to be realized from the sale of each bull or heifer. As outlined in the private placement memoranda, the stated goal of the investments was to breed these registered heifers with champion bulls thereby developing superior offspring. The progeny of the original herd were then to be sold at various times during the nine year life of the investment.

The offering materials contained opinions of tax counsel that investors would be entitled to claim tax benefits, including an investment tax credit on the total (cash and note) purchase price of the herds in the first year and accelerated depreciation over the useful life of the cattle. Plaintiffs invested in the program partly as a tax shelter, and they claimed the deductions and credits described in the offering circular.

Plaintiffs were attracted to the investment because of the possibility of long-term capital gain, substantial tax benefits (including investment tax credit, deduction of operating expenses and accelerated depreciation), and a rate of financing substantially below market rates. In theory, plaintiffs' herds would operate at a loss for the first few years, offering the possibility of tax benefits. In later years, the sale of the offspring and eventually of the herd itself would generate sufficient revenue to satisfy plaintiffs' obligations under the promissory notes, and possibly net long-term capital gains.

The offering circulars disclosed that the cattle could be purchased by Lovana from Carlos and Fred Lovell, the partners in Lovell Cattle Company, a Georgia partnership. It also disclosed that Carlos and Fred Lovell were, respectively, the father and the uncle of Virgil Lovell, the sole shareholder of Lovana Farms, Inc.

Approximately half of the Plaintiffs invested in one program offered by Lovana Farms, Inc. that was financed by both recourse and nonrecourse promissory notes. The other plaintiffs invested in three other programs that were financed solely by recourse notes. The notes and the interest were not to become due until 1987.

As disclosed in the offering materials, Lovana purchased the plaintiffs' heifers from Lovell Cattle with a long-term promissory note. On resale of the cattle to plaintiffs, they assumed notes and became indebted to Lovell Cattle.

The structure of the note portion of the purchase price permitted plaintiffs to defer payment of the bulk of the purchase price until the end of the program. The notes all bore interest at a 9 percent annual rate. Payment of interest and principal was deferred until the end of each note's term and was required to be made in roughly equal installments during the last two or three years of the 9 or 10 year terms. Payment of the notes was secured by the investors' initial cattle herds and all offspring generated during the programs. The noteholders, either Lovell Cattle Company (in the case of all recourse notes) or Lovana Farms, Inc. (in the case of all Brangus non-recourse notes), were required first to seek payment of the notes out of the proceeds of the herd liquidation.

Because it was offered prior to the enactment of pertinent tax law changes in late 1981, the 1981 Brangus program involved substantially different notes. In that program, roughly half of the purchase price for each animal was paid with a "non-recourse" note payable to Lovana Farms, Inc., which could only be collected from the proceeds of the sale of the cattle herd beginning in the eighth year of the program. Brangus investors were not personally liable on the non-recourse notes. The remaining notes in the Brangus program and the entire note balance in the other three programs were fully recourse, plaintiffs were personally liable to Lovell Cattle Company on all these notes.

After plaintiffs made their first payments, they began to receive quarterly herd reports which indicated the status of those animals belonging to their own herd and whether any of those animals had generated any offspring. In addition, if any

herd animals or offspring were sold, the herd report indicated the price brought by each bull or heifer. By July of 1984, Plaintiffs had each owned their herds for approximately two and one-half years. Their July 1984 individualized herd report indicated, for example, that the herds had generated from two to six offspring. By contrast, the projections indicated that each of the original herds should have generated approximately fifteen or sixteen offspring by that time. The figures for total average sales also did not nearly meet the prices projected for this time period.

In January and September of 1983, Lovana sent plaintiffs two communications which indicated that investors in Lovana Farms programs sold in 1978, 1979, and 1980 were being examined or audited by the Internal Revenue Service. Those communications explained the basis of the Service's challenges to those investors' returns. Specifically, plaintiffs were told that the IRS was contending that (1) the investors had not invested in Lovana for profit; (2) the benefits and burdens of ownership had not passed from Lovana to the herd owner; (3) the basis on which investors had computed their depreciation and investment tax credit was excessive because it was based on a purchase price in excess of fair market value; and (4) the management fee was not an ordinary and necessary expense, and therefore was not deductible.

Plaintiffs were also told that the IRS had obtained a list of the 1981 and 1982 Lovana investors and that it was threatening to disallow all deductions related to the herds unless investors agreed to limit their deductions to an amount equal to cash payments made.

On December 7, 1983, Virgil Lovell was arrested for paying a bribe to an IRS agent in an effort to stop an investigation of Lovana Farms investments. This bribe, alleged to be $400,000 which was thought to be the largest in the history of the IRS, received substantial publicity including articles in the *Washington Post, The Atlanta Journal/Constitution,* and *Newsweek.*

After the arrest, Lovana Farms wrote to plaintiffs informing them that everything was "business as usual" at Lovana Farms. On December 22, 1983, Virgil Lovell wrote to each investor indicating that he had a "fine team of defense lawyers" who were going to defend the charges made against him by the government. In September of 1984, plaintiffs received a letter typed on an FSC typewriter on FSC stationery from the "Investors Committee", a group comprised of two investors and an FSC representative, informing them that because of a severe downturn in the beef market and Virgil Lovell's bribery arrest and health problems, plaintiffs' investments were no longer viable. Mr. Thomas W. Hutchins of FSC also attended the Investors Committee's meetings. The investors were told in this communication that their options were 1) to suffer liquidation of their herds and payment when due of their alleged notes; 2) to take possession of their animals after making an additional cash payment of $1,000 per animal; or 3) to exchange their herds and release all claims against Lovana Farms. The investors were advised in this September 14, 1984 memorandum that Lovana had already set a date of October 3, 1984 for a liquidation sale. The plaintiffs opted to sign the release and were presented with a "Mutual Release Agreement" in which Lovell Cattle Company agreed to accept the assignment of plaintiffs' cattle in full payment and discharge of the recourse promissory notes and agreed to deliver those notes to plaintiffs endorsed "satisfied". Lovana Farms further agreed to release plaintiffs from the maintenance agreement they had signed, and in some instances also released plaintiffs from non-recourse notes entered into between plaintiffs and Lovana Farms. In consideration for the release from the maintenance agreement, plaintiffs agreed to transfer both ownership of their herds and any money remaining in the herd owners reserve accounts to Lovana Farms. The release provided that in consideration of the covenants recited in it, Lovana Farms, Lovell Cattle Company and plaintiffs released and discharged each other, their successors, officers, directors, shareholders, employees,

agents, advisors, attorneys, underwriters and their registered representatives from any and all claims arising out of or connected to plaintiffs' purchase of cattle from Lovana and Lovana's management of that cattle. The release returned the parties to their *ex ante* bargaining position except for the loss of the money plaintiffs originally invested.

The releases contained both a merger clause and also a choice of law clause specifying Georgia law as the law applicable to the agreement.

 Plaintiffs allege fraudulent misrepresentations and omissions by certain defendants in the original investment, during the duration of the investment and in obtaining releases from plaintiffs. As regards plaintiffs' allegations regarding fraud in the initial purchase of the investments, plaintiffs assert, based on the testimony of one of the accountants, that Lovell Cattle acquired cattle during the relevant time period for a cost of between $500 and $1500 but that Lovell Cattle would in turn sell the cattle to Lovana Farms at a mark up for $4,000 to $4,500 per cow. Plaintiffs also rely on the former testimony of an IRS agent regarding approximately 2000 cows in various Lovana ventures that the average cost to Lovana Farms was $775.00 per head of cattle.[1]

## DISCUSSION

Plaintiffs base their claims of fraud on various alleged omissions and misrepresentations by defendants in procuring plaintiffs' initial investments, in allegedly continuing to conceal these omissions and misrepresentations from plaintiffs during the course of the investments and in inducing

plaintiffs' purported release of claims against defendants.

This case involves four programs sold to the various plaintiffs, each of which was marketed with a "Private Placement Memorandum" or prospectus and supporting documents including financial and herd growth projections. The 1981 Brangus program involved plaintiffs Ray and Marie Bernier, Robert McHale, William R. and Cheryl Moore and Barry and Edna Wiggins. The 1981 B Cattle Breeding Program involved plaintiffs Wayland and Patricia Blowe and mark J. and Sylvia Driscoll. The 1981 Fall Calving Program involved plaintiffs Oliver and Jean Darden, Mary and John Greenwood and Lenor Knapp. The 1981 Winter Cattle Breeding Program involved plaintiffs Mark J. and Sylvia Driscoll.

Plaintiffs contend that the actual value of the cattle in each of these programs at the time of purchase was between $500 and $1500 while plaintiffs paid approximately $8,000 a head for the same cattle including both the initial investment and the indebtedness on the promissory notes. Plaintiffs also contend that the private placement memorandum contained false and misleading statements including: a) "The price to Owners may be above industry averages; however, Lovana believes the heifers to be acquired are above average in quality and such price will not exceed the value of the assembled Herds." b) "Lovana will receive a gross profit from the sale of cattle to an Owner of a maximum of [$4,000] [$1,000] per heifer which is reduced by the value of the replacement guarantee and warranties of Lovana." c) "Lovana believes the price of a Herd to an Owner reflects the value of the assembled Herd; however, there is no

1. Plaintiffs allege RICO violations and company-wide fraud in the failure of defendants to inform all Lovana investors of the purported mark-up of the purchase price of the cattle. Agent Amon's testimony is the best evidence in support of such an allegation. The court believes that this testimony is admissible as prior testimony under FRE 804(b)(1) or alternatively under 804(b)(5) as it has great circumstantial guarantees of trustworthiness and is more probative as to the average price of Lovana cattle than any other evidence plaintiffs can procure

on this point because the Lovell defendants have consistently asserted their Fifth Amendment rights in refusing to answer questions about the price paid for the cattle.

Because of accountant Alsup's testimony regarding the cost of the cattle and the testimony of IRS agent Amon, plaintiffs are entitled also to draw an adverse inference from the Lovell defendants and attorney Shannonhouse's refusals based on their Fifth Amendment privilege to answer plaintiffs' questions regarding the price paid for the cattle.

assurance that upon resale an Owner could recoup his cost." d) "Lovana intends to conduct its management of the Herds in such a manner that a minimum of conflicts will arise.... Further, when a conflict arises, Lovana will make every effort to resolve any conflicts that arise to the best advantage of Owners and their Herds; ...." e) "The Internal Revenue Service has indicated it is concerned about the purchase of breeding animals at what it may deem to be an inflated cost. Although the purchase price of breeding animals acquired by Owners may be in excess of industry averages, Lovana believes it should not exceed the value of the assembled Herd; ...." f) "The price paid by investors for cattle will include a mark-up over the cost to Lovana. Lovana believes, however, that the price paid for a Herd does not exceed the value of the assembled Herd." g) "We understand that it is your belief that the aggregate purchase price of the Herds does not exceed the value of the assembled animals ..."

Plaintiffs allege that these statements coupled with the evidence that the price they paid for the animals far exceeded the $500 to $1500 value of the animals, indicates that defendants misled plaintiffs in their decision to invest. Plaintiffs allege that the structure and relationship of Lovana Farms and Lovell Cattle Company precluded these defendants from minimizing conflicts of interest as represented inn the private placement memorandum.

Plaintiffs allege that the effect of the Offering Circular was similarly to mislead plaintiffs in their knowledge of the structure of the investments, the value of the herds, and the ability and desire of the Lovell defendants to limit conflicts of interest in the investments.

Plaintiffs allege that certain misrepresentations appear in the Projections that were made available to plaintiffs along with the Private Placement Memorandum. Plaintiffs allege that the Projections contained the following misleading information: Each set of projections summarized "after tax" benefits to include investment tax credits in the amount of ten percent of the purchase price of the herds. Given the alleged discrepancy between the price paid by the plaintiffs for the animals and the actual value of the animals, plaintiffs contend that the projections were off by as much as ninety-percent. Additionally, plaintiffs contend that the projections misleadingly assume that all offspring would sell for a minimum of $1,600 per head. Plaintiffs contend that these representations concerning projected investment tax credits and projected offspring sales are further misrepresentation to investors that the value of the property was the full amount described in the private placement memorandum and not the allegedly much lower actual value plaintiffs contend was actually the case.

Plaintiffs contend that both the defendant attorneys and the defendant accountants were aware of these discrepancies yet did not inform the investors and indeed in the face of this alleged knowledge proceeded to issue a tax opinion letter and projections for the 1981 Brangus Program respectively. Plaintiffs contend that thereafter the defendant accountants refused to issue additional projections as accountant Alsup had concluded that those projections were unreasonable because the market for cattle would be so significantly saturated by like herd programs that he could not assume that the cattle sold would yield the prices projected. Plaintiffs contend that defendant Overcash Alsup continued to serve as defendant Lovana Farms' accountants nevertheless. Plaintiffs contend that defendants FSC, FSC Securities and Schuttler failed to discharge their duty to properly conduct a due diligence investigation by failing to discover the alleged discrepancies primarily the decision of the accountants to no longer prepare projections for the Lovana cattle programs.

Regarding the plaintiffs' allegations of continuing fraud, plaintiffs contend that following their investments they received various items of correspondence including herd reports, annual reports and promotional correspondence from Lovana Farms. Plaintiffs do not allege that any of the facts stated in the herd reports or annual financial reports are untrue. Nor

do plaintiffs deny that the herd reports showed that, at least for the first year of the programs, the offspring from their herds were not being sold for prices consistent with those predicted in the projections. .

Plaintiffs admit that the private placement memorandum had warned that the cattle market was volatile, that culls would be removed from the herds and that their investment was subject to risks which might affect its capital gains success. Plaintiffs contend; however, that not knowing that the entire Lovana Farms enterprise was producing similarly disappointing results precluded plaintiffs from ascertaining that the problems could have been the result of problems with the programs other than bad luck. Plaintiffs contend that the correspondence received by the plaintiffs from Lovana Farms, FSC and the "Investors Committee", continued to conceal what plaintiffs characterize as the true reason for both the IRS investigation of the programs and the failure of the herds to produce offspring worth $1600 per head, e.g. that their cattle was worth so little from the beginning of the investment.

All defendants have moved for summary judgment on the mutual release agreements signed by the plaintiffs. Paragraph 6 of the release provided as follows:

> 6. *Mutual Release.* In consideration of the covenants herein, Lovana, Lovell and Herd Owner, for themselves, their heirs, successors, officers, directors, shareholders, employees, agents, advisors, attorneys, underwriters and their registered representatives from any and all claims arising out of or in any way connected with Herd Owner's purchase of purebred cattle from Lovana and the management thereof.

*See e.g.,* Greenwood Ex. 20, ¶ 6.

Plaintiffs contend that summary judgment is improper on the basis of the releases because a) the releases were made in re-

spect to claims which were not known or reasonably should have been known by plaintiffs at the time the releases were executed and b) the releases were obtained by subsequent fraud on plaintiffs by defendants. Plaintiffs additionally argue that even if the releases are enforceable and they explicitly release defendants Lovana Farms and Lovell Cattle Company, the language of the releases does not clearly evidence the intent to release the other defendants. Finally, plaintiffs contend that the release agreements constituted a repurchase of securities which triggered a diligence and disclosure duty on defendants' part under Rule 10b–5; a duty plaintiffs contend was not met.

As regards plaintiffs' allegations of fraud in inducing plaintiffs to sign the releases, plaintiffs contend that the Investors Committee was controlled by FSC and that the contents of the September 14, 1984 memorandum spelling out the investors' options along with contemporaneous representations to the plaintiffs constituted fraud in the inducement for plaintiffs to sign the releases.

Because the court finds that the Mutual Release Agreements signed by each plaintiff are enforceable and effective to grant summary judgment in favor of all defendants, discussion of defendants' possible other grounds for summary judgment is unnecessary.[2]

 By its terms, the releases are governed by Georgia law. *E.g.,* Driscoll Ex., ¶ 10–11. Generally, a party with the capacity and opportunity to read a written release, who executes it, not under any emergency, and whose signature was not obtained by trick or artifice is bound thereby. *Daniel v. Conrad,* 242 Ga. 119, 249 S.E.2d 603 (1978); *Bass v. Citizens & Southern Bank,* 168 Ga.App. 668, 309 S.E.2d 850 (1983). The only fraud which relieves a party who can read a document from the

---

**2.** Defendants also moved for summary judgment on the following grounds: that the statute of limitations bars plaintiffs' claims; that the various documents provided by defendants contained no misrepresentations; that the attorneys and accountants owed no duty to plaintiffs un-

der Rule 10b–5; that plaintiffs failed to produce evidence of scienter; and that several plaintiffs specifically admitted that they did not read the offering materials and did not rely on certain defendants in making their investment decisions.

effect of that document is fraud which prevented the party from reading it. *Henry v. Anderson*, 164 Ga.App. 110, 296 S.E. 2d 410 (1982); *Curtis v. First National Bank of Commerce*, 158 Ga.App. 379, 280 S.E.2d 404 (1981). Plaintiffs have not alleged any such fraud. Thus, plaintiffs' contentions that defendants committed fraud in the inducement of the releases, even if true, would not disturb the effect of the releases because plaintiffs have not alleged fraud in the actual procurement of the releases.

■ Moreover, defendants' alleged fraud is not actionable because none of the alleged fraudulent representations were stated in the releases themselves, each of which contained a "merger" clause. Paragraph 7 of each Mutual Release Agreement entitled "Entire Agreement" states that "...no representation, inducements, promises or agreements, or otherwise, not embodied herein shall be of any force or effect." (E.g., McHale Ex. 12, ¶ 7). In *Charter Medical Management v. Ware Manor*, 159 Ga.App. 378, 283 S.E.2d 330 (1981), the court dismissed allegations of fraudulent misrepresentations, holding that a merger clause was effective to preclude Ware Manor's contentions that it relied on Charter's representations in executing the contract. Georgia law provides that when a contract contains a merger clause and plaintiffs have not alleged that they were prevented from reading the contract and there is no allegation that the contract itself contains any false representations, plaintiffs may not argue that they were fraudulently induced to sign the contract. *Alpha Kappa Psi Building Corp. v. Kennedy*, 90 Ga.App. 587, 83 S.E.2d 580 (1954); *SCM Corp. v. Thermo Structural Products, Inc.*, 153 Ga.App. 372, 374, 265 S.E.2d 598 (1980). Here, the merger clause, by its

terms, extinguishes all other representations made before the releases were entered into by the parties.[3]

Plaintiffs contend that if they had been aware of the "real facts" of defendants' alleged fraudulent scheme, they would never have released their claims. This argument was explicitly rejected in *Henslee v. Houston*, 566 F.2d 475 (5th Cir.1978). There, the court found "meritless" a plaintiff's contention that a release agreement may not release a claim resting upon fraud unless the facts alleged to constitute fraud were known to the plaintiff at the time the release was executed.

■ In support of their position that prior knowledge of such facts is necessary to execute a valid release, plaintiffs cite *Goodman v. Epstein*, 582 F.2d 388 (7th Cir.1978), cert. den. 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979), which in interpreting the force of 15 U.S.C. § 78cc(a), found that statute "...mandates that a purported release of claims under federal securities laws is valid *only* as to mature, ripened claims of which the releasing party had knowledge before signing the release." (emphasis in original).[4] Plaintiffs in the case at bar thus argue that federal statutory law provides some check on parties' ability to enter into mutual release agreements.

To the extent that *Henslee* is not fully controlling of the outcome of this issue, this court declines to follow the Seventh Circuit's reading of § 78cc(a). *Goodman* explicitly relies on the much-eroded precedent of *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) for the proposition that any attempt to release a claim *in futuro* is invalid. Neither the Supreme Court nor the Eleventh Circuit has gone so

---

**3.** This holding also covers plaintiffs' contention that information contained in the September 14, 1984 Investors Committee memorandum was fraudulent. Additionally, even assuming plaintiffs' contention that the FSC defendants controlled the Investors Committee, the Committee was not a party to the releases and plaintiffs would not have been entitled to rely on its representations. *Daniel v. Conrad*, 242 Ga. 119, 249 S.E.2d 603 (1978). In any case, the merger clause extinguished any previous representa-

tions other than those made in the releases themselves.

**4.** 15 U.S.C. § 78cc(a) provides that any:
...condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of an exchange required thereby shall be void.

far as to extend *Wilko* to facts such as those in this case, and in light of the Court's consistent undermining of that precedent, this court believes its reasoning should not be so extended. *See discussion Shearson/American Express v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 2338–2343, 96 L.Ed.2d 185 (1987). This court finds that no federal policy overrides state law as to the validity of the releases at issue here, nor does any such policy prohibit extra-judicial resolution of securities fraud claims. *See Finn v. Prudential–Bache Securities, Inc.,* 821 F.2d 581, 586, n. 5 (11th Cir.1987) (applying the state law chosen by the parties to evaluate the validity of a release of federal securities law claims); *Pettinelli v. Danzig,* 722 F.2d 706 (11th Cir.1984); (applying state law to the issue of the validity of the release of federal securities law claims).

In the case at bar, no attempt was made to prospectively waive compliance with the securities laws. Indeed, the releases were signed after plaintiffs, by their own admission realized that the deal had gone sour. At that time plaintiffs were presented with the option of the certainty of cutting their losses by returning the cattle in exchange for discharge of their indebtedness on the promissory notes, or continuing their indebtedness while preserving their claims. While not the most savory of choices, plaintiffs were under no duress. *Tidwell v. Critz, et al.,* 248 Ga. 201, 204, 282 S.E.2d 104 (1981); *Ryder Truck Lines, Inc. v. Goren Equipment Co.,* 576 F.Supp. 1348, 1355 (N.D.Ga.1983) (Ward, J). Plaintiffs were not precluded from reading the releases; they understood that they were releasing their claims and exercised that option rather than gambling on the legal outcome of a defense against the notes. Were the court to invalidate these releases, future similarly situated parties might not be able to similarly bind themselves contractually and avail themselves of this option.

Plaintiffs relying on *Posey v. Medical Center–West, Inc.,* 257 Ga. 55, 354 S.E.2d 417 (1987), argue that those defendants whose *names* do not appear in the releases are not released. In *Posey* the Georgia Supreme Court eliminated the long-stand-

ing rule that the release of on joint tortfeasor releases all joint tortfeasors. In its place, the Court adopted the standard set forth in the Restatement (Second) of Torts, § 885(1) (1979), which states:

> A valid release of one tortfeasor from liability for a harm, given by the injured person, does not discharge others for the same harm, unless it is agreed that it will discharge them.

Plaintiffs argue from this holding that unless each defendant's name appears in the release, that defendant is not released. The Court in *Posey* refused to give effect to the contended release of a hospital based on a release that applied to "an automobile driver and all other persons, firms or corporations". Here, the release is much more comprehensive and explicit.

■ Whether the terms of an agreement are clear or ambiguous is a question of law for the Court. *Davis v. United Life Insurance Co.,* 215 Ga. 521, 526, 111 S.E.2d 488 (1959); *Honea v. Gilbert,* 236 Ga. 218, 219, 223 S.E.2d 115 (1976); *Management Assistance, Inc. v. Computer Dimensions,* 546 F.Supp. 666, 673 n. 4 (N.D.Ga.1982) (Shoob, J.). Only if ambiguity remains after the Court applies the appropriate rules of construction does the parties' intent become a question for the trier of fact. *Id.* Here, the court finds that the references within the releases unambiguously release each of the defendants. The release agreement expressly released "Lovana Farms, Lovell Cattle Company, their successors, officers, directors, shareholders, employers, *agents, advisors, attorneys, underwriters,* and their *registered representatives* from any and all claims arising out of or in any way connected to plaintiffs' purchase of cattle from Lovana and the management thereof" (emphasis added). The court feels this language evidences the intent to release not only the principals or promoters of the investments, but all securities people ("underwriters and their registered representatives") and all professionals ("agents, advisors, attorneys") involved in the deal. Plaintiffs have created no factual issue as to whether defendant accountants were the Lovell defendants' ad-

visors or agents. Likewise, there is no factual issue as to the participation of the defendant attorneys and securities people.

▉▉▉ Plaintiffs make one further argument to void the effect of the releases. Plaintiffs argue that the execution of the Mutual Release Agreements were actually a "repurchase of securities", imposing upon defendants the duties of disclosure mandated under Rule 10b–5. However, the court feels that an analysis of the definition of the term "security" as set forth in Supreme Court caselaw conclusively demonstrates as a matter of law that the releases at issue here are not a "security". The test for a "security" is (1) the presence of an investment, (2) in a common venture, (3) premised on a reasonable expectation of profits, which is (4) to be derived from the entrepreneurial or managerial efforts of others. *United American Bank of Nashville v. Gunther,* 620 F.2d 1108 (5th Cir. 1980) (citing *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975); *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

Applying this test to this case, the releases do not constitute a security. The releases involve only the cancellation of a management agreement and certain indebtedness by the Lovell and Lovana defendants in exchange for plaintiffs' return of their herds to those defendants. In addition, the parties released each other from any claims. Such does not constitute a common venture; it is not premised on a reasonable expectation of profits; and there are no profits to be derived from the entrepreneurial or management efforts of others. Thus, the *Howey–Forman* test is not met by the release agreements and no duty under Rule 10b–5 flowed from their proposed execution.

To require defendants to abide by the requirements of Rule 10b–5 in connection with the termination of an investment and exchange of releases would mean in effect that an issuer must produce another prospectus prior to the execution of a mutual release. Such would make settlement of such claims virtually impossible. Neither

the federal securities laws nor any case pointed to by plaintiffs support such a position.

The court holds that the releases in this case are valid and effective as to all defendants for any liability a part of this motion. The court accordingly GRANTS defendants' motion for summary judgment in all respects. The court notes; however, that defendants have failed to move for summary judgement on plaintiffs' state and federal RICO counts. Seeing no basis for such claims in the absence of the underlying securities claims, the court DIRECTS plaintiffs to show cause not later than June 10, 1988 why summary judgment should not be entered against them on those counts.

SO ORDERED.