**SOUTHERN BUSINESS COMMUNICATIONS, INC., Plaintiff,**

v.

**MATSUSHITA ELECTRIC CORPORATION OF AMERICA d/b/a Panasonic Communications & Systems Company, Defendant.**

Civ. No. 1:90–cv–999–JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 15, 1992.

Jeffrey F. Leasendale and Frank J. Klosik, Jr., Atlanta, Ga., for plaintiff.

Thomas C. Harney and Mary L. Walker, Atlanta, Ga., for defendant.

## ORDER

CARNES, District Judge.

This case is presently before the Court on the Defendant's Motion for Summary Judgment [14–1]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below,

concludes that Defendant's Motion for Summary Judgment should be GRANTED.

## A. FACTUAL BACKGROUND

Plaintiff Southern Business Communications, Inc. ("SBC") is a Norcross, Georgia based corporation that is in the business of, among other things, selling office communication equipment such as color copiers. Defendant Matsushita Electric Corporation of America ("Panasonic") is a Delaware corporation with its principal place of business in New Jersey. Panasonic is the master distributor of a full line of commercial photocopy machines manufactured by its Japanese parent company.

Plaintiff's complaint consists of six counts. The first two counts raise state law claims. In Count I, Plaintiff alleges that Defendant committed tortious interference with its business relationships. Count II alleges that Defendant's actions constituted breach of contract. Plaintiff's last four claims arise under federal antitrust law. Counts III and IV claim violations of the Sherman Antitrust Act. In Count III, Plaintiff alleges that Defendant conspired and attempted to monopolize in violation of 15 U.S.C. § 2. In Count IV, Plaintiff asserts that Defendant restrained trade in violation of 15 U.S.C. § 1. Count V and VI state violations of the Robinson–Patman Act. Count V alleges that Defendant's actions violated 15 U.S.C. § 13(a), while Count VI alleges a violation of 15 U.S.C. § 13(e).

Based on the parties' statements of undisputed material facts and responses thereto, viewing all evidence and factual inferences in a light most favorable to the non-moving party, the following facts emerge as undisputed:

1. Panasonic distributes the FP–C1 copier, a full color copier, nationwide using, in many cases, a network of authorized Panasonic dealers.

2. Numerous other manufacturers make and sell other, competitive, full color copiers.

3. There are four authorized dealers of Panasonic copiers in the Atlanta area: SBC, FirstCopy Corporation ("FirstCopy"), Metro Atlanta Business Systems, Inc., and U.S. Business Equipment, Inc. Additionally, Panasonic acts as dealer itself by virtue of its sales through its National Accounts Program ("NAP").[1]

4. Plaintiff became an authorized dealer for the FP–C1 full color copier by virtue of an authorized dealer agreement signed in August 1989, under which SBC was authorized to sell the FP–C1 copier in Cobb, Gwinnett, Fulton, and DeKalb counties.[2]

5. Under Panasonic's dealer distribution system, dealers such as SBC purchase copiers wholesale from Panasonic, then resell the copiers at retail for their own account.

6. Panasonic sold FP–C1 copiers to SBC for $9,995.00.

7. SBC initiated contact with the DeKalb County School System ("DeKalb County") in the Fall of 1989. SBC demonstrated the FP–C1 copier to the DeKalb County officials and created a proposal for the sale of the product that would meet DeKalb County's specifications.

8. In December 1989 a Panasonic district sales manager, Ken Simmons, had a conversation with Larry Craver, a salesman for SBC, about the negotiations between DeKalb County and SBC.

9. In early 1990 DeKalb County decided that it would engage in the bidding process to buy its full color copiers. A bid invitation was prepared, with SBC's help, that contained the specifications for an FP–C1 copier, although it did not specify that copier by name.

10. In late March 1990 SBC asked Jim Davis, an area sales manager for Panason-

---

**1.** *See infra* note 3 for a description of the National Accounts Program.

**2.** The authorized dealer agreement reserved to Panasonic the right to "solicit and make direct sales of the Products to anyone, anywhere, and

to appoint additional dealers of the Products and/or distributors, sales agents or sales representatives for the Products ... without any obligation to DEALER of any kind." Ex. D to Def.'s Mot. for Summ. J. ¶ 2.

ic, for a manufacturer's certificate.[3] Mr. Davis did not inform his co-workers of SBC's efforts to sell copiers to DeKalb County.

11. In early April 1990 another authorized Panasonic dealer, FirstCopy, saw DeKalb County's bid advertisement and decided to respond to it.

12. On April 1, 1990 Panasonic instituted its new National Accounts Program ("NAP").[4] However, NAP was not introduced to the Atlanta distributors at this time.

13. On the morning of April 6, 1990 a representative from SBC called Jim Davis, the Panasonic sales manager who had been involved in issuing the manufacturing certificate to SBC, to ask if anyone else had requested a manufacturer's certificate in order to bid on the DeKalb sale. Mr. Davis correctly responded that no one else had.

14. Panasonic's employees spent most of the day of April 6 in a meeting discussing the new NAP. After this meeting, Ray Johansen, President of FirstCopy, came to Panasonic to talk about submitting a bid to DeKalb County in response to the advertised solicitation for bids. Mr. Johansen saw Mr. Davis and told him that he wanted to make a bid and needed a manufacturer's certificate.

15. Mr. Davis did not, when speaking to Mr. Johansen, think about his earlier conversation with SBC and did not recognize that FirstCopy's interest was in the same sale that SBC was pursuing. Mr. Davis referred Mr. Johansen to Jorge Velasquez,

the Panasonic representative in charge of NAP for the southeastern United States. Mr. Davis did not further participate in the conversation between Johansen and Velasquez and did not tell Mr. Velasquez of SBC's interest in the DeKalb invitation to bid.

16. Mr. Velasquez informed Mr. Johansen about the NAP. The decision was made that Panasonic would bid in response to the DeKalb County solicitation, with FirstCopy acting as Panasonic's authorized fully commissioned representative under NAP.[5]

17. FirstCopy had prepared a bid for submission to DeKalb prior to speaking with Mr. Velasquez. However, as a result of the NAP bid, FirstCopy did not submit its own bid.

18. At the time of the bid to DeKalb County, FirstCopy was not an authorized, qualified dealer under NAP as its NAP agreement was not effective until April 27, 1990. Additionally, no other dealer in the Atlanta area was a qualified dealer under NAP.

19. At all times prior to and including the date of the submission of bids to DeKalb, SBC had not been informed of the NAP although it was qualified for the program.

20. Using NAP pricing, Panasonic submitted a bid to DeKalb County offering a total price over a five year period of $53,620.00 per machine. SBC's bid was for $158,480.00 per machine over five years.

---

3. A manufacturer's certificate is needed to make a bid. It is a certificate from the manufacturer or master distributor saying that the dealer is an authorized dealer of the product in good standing and that the manufacturer or master distributor will ensure that the conditions of the bid are satisfied.

4. NAP provides a vehicle for selected authorized Panasonic dealers to act as representatives of Panasonic for sales to governmental, educational, non-profit medical, and large commercial accounts. This program permits Panasonic to compete with products of other manufacturers at national and other levels where Panasonic determines that its direct involvement is desirable. Dealers who qualify as authorized representatives under NAP can bring potential cus-

tomers to Panasonic for handling pursuant to NAP, with the dealer in that case acting as Panasonic's commissioned authorized representative for the sale from Panasonic to that customer. Alternatively Panasonic, upon identifying an appropriate NAP customer, can appoint one of the authorized NAP representatives to act as the representative in that sale. NAP has its own pricing structure for direct sales to the end use customer by Panasonic, using a NAP representative.

5. Plaintiff's assertion, which this Court accepts as true for purposes of summary judgment, is that the decision to bid under NAP was made not by Mr. Velasquez, but rather by his superiors at Panasonic.

21. DeKalb County opened the bids on April 10 and chose Panasonic over SBC.

22. SBC enjoyed a good business relationship with DeKalb County prior to the submission of the Panasonic bid, and has done virtually no business with DeKalb since that time.

## B. DISCUSSION

### 1. The Standard for Summary Judgment

■ Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552.

The movant bears the initial responsibility of asserting the basis for his motion. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Apcoa, Inc. v. Fidelity National Bank*, 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleading" and present competent evidence [6] designating "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ A fact is material when it is identified by the controlling substantive law as an essential element of the non-moving party's case. *Id.* at 248, 106 S.Ct. at 2510. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. at 2510–11. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " [7] *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249–50, 106

---

**6.** The non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *See Ross v. Bank South*, 837 F.2d 980, 999 (11th Cir. 1988). However, the mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment. *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir.1984). Likewise, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assoc. v. U.S. Industries,* 736 F.2d 656, 657 (11th Cir. 1984).

**7.** This standard mirrors the standard for a judgment as a *matter of law (previously called a directed verdict)* at trial. The question under each is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 250–52, 106 S.Ct. at 2511–12.

S.Ct. at 2511. Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

■ Summary judgment may be especially appropriate in an antitrust case because of the chill antitrust litigation can have on legitimate competition. *McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1493 (11th Cir.1988). For this reason, "when opposing a motion for summary judgment, an antitrust plaintiff must present evidence that tends, when interpreted in a light most favorable to plaintiff, to exclude the possibility that defendant's conduct was as consistent with permissible competition as with illegal conduct." *Id.*

### 2. The Antitrust Claims
### a. Section 1 of the Sherman Antitrust Act

Section 1 of the Sherman Antitrust Act prohibits every "contract, combination in the form of trust of otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. The Supreme Court has construed Section 1 as barring only those combinations that are "unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States*, 221 U.S. 1, 58, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911).

■ In order to establish a violation of Section 1 under the law in this circuit, Plaintiff must prove that (1) Panasonic conspired to use unfair and predatory competitive means to eliminate SBC as a competitor, and (2) SBC's elimination from the marketplace in this fashion imposed an illegal restraint on trade under the rule of reason analysis.[8] *L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 417 (11th Cir.1984). It is clear that the mere fact that a defendant causes injury to

a competitor, even if done by use of "unfair" means, is not sufficient to constitute a violation of Section 1. In *Draper*, the Eleventh Circuit observed that the rule in this circuit is that " 'injury to a competitor need not result in injury to competition. The use of unfair means ... without more does not violate the antitrust laws.' " *Id.* at 421 (quoting *Manufacturing Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1043 (11th Cir.1982)). Rather, to establish a violation of the Sherman Act a plaintiff must show both an injury to itself as a competitor and an injury to competition in general. *Id.*

■ In order to show an injury to competition in general, an antitrust plaintiff must first establish a "particularized or relevant market in which the defendant's actions unreasonably restrained trade." *Id.* at 422. This threshold requirement exists because "[e]valuations of the market power of the parties involved and the anticompetitive effect of an alleged restraint, both of which are essential to the rule of reason analysis, are rendered impossible in the absence of proof regarding the economic significance (or relevance) of the market allegedly influenced by the defendant's conduct." *Id.* The plaintiff has the burden of establishing a "well-defined relevant market upon which the defendant's alleged anticompetitive conduct might be judged" and, absent such a showing, the defendant is entitled to judgment as a matter of law as there is "simply no way for the jury to conduct the rule of reason analysis required." *Id.* at 426 (affirming district court's directed verdict when plaintiff failed to establish a relevant market). *See also E.T. Barwick Industries v. Walter E. Heller & Co.*, 692 F.Supp. 1331, 1347 (N.D.Ga.1987) (granting summary judgment when plaintiff failed to establish a relevant market).

■ The "relevant market" is defined generally as "the area of effective competi-

---

**8.** Both parties agree that the rule of reason analysis, rather than the *per se* analysis used for certain more serious violations, is appropriate in this case. The rule of reason requires "a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition."

*DeLong Equip. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1507 (11th Cir.1989), *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990) (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984)).

tion." *Brown Shoe Co. v. United States,* 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). The relevant market must include both a product dimension and a geographic dimension, both of which must be shown to be economically significant. *Draper,* 735 F.2d at 423. In *E.T. Barwick Industries v. Walter E. Heller & Co.,* Judge Murphy explained the rationale behind this two-pronged showing:

> [t]o define a market in product and geographic terms is to say that if prices were appreciably raised or volume appreciably curtailed for the product within a given area, while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price and volume.

692 F.Supp. at 1344 (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,* 792 F.2d 210, 218 (D.C.Cir.1986), *cert. denied,* 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987)).

The geographic dimension of the relevant market is the "area in which the product or its reasonably interchangeable substitutes are traded." *Draper,* 735 F.2d at 423. In order to constitute a relevant market, purchasers within the geographic area must, as a practical matter, be unable to turn to suppliers outside the area. *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961).

SBC has not attempted to define the geographic dimensions of the relevant market in which Panasonic has allegedly restrained trade. In its complaint, SBC alleged that Panasonic restrained trade in "the state of Georgia and in other states." Compl. ¶ 48. However, in its response to Defendant's Motion for Summary Judgment, SBC appears to assert that the relevant market is the Atlanta area. Pl.'s Resp. to Def.'s Mot. for Summ. J. at 14. In neither case did SBC present any evidence that could support an inference that if prices increased in the given geographical

area, purchasers could not obtain similar products from distributors located elsewhere. Thus SBC, like the plaintiff in *Draper,* has failed to produce sufficient evidence on the operation of any geographic area as a relevant market to create a genuine question of fact as to whether there was any injury to competition in general. *Draper,* 735 F.2d at 425.

Moreover, even assuming that SBC established the existence of a relevant geographic market, the Court concludes that Plaintiff has failed to produce evidence of an injury to competition in general that is sufficient to withstand summary judgment. SBC asserts that the relevant product market in this case is the Panasonic FP–C1 color copier. Compl. ¶ 48; Pl.'s Resp. to Def.'s Mot. for Summ. J. at 14. However, in determining the relevant product market "it is the use or uses to which the commodity is put that control." *United States v. E.I. Du Pont de Nemours & Co. ("Du Pont"),* 351 U.S. 377, 395–96, 76 S.Ct. 994, 1008, 100 L.Ed. 1264 (1956).[9] The product dimension of the relevant market is determined by the "availability of substitutes to which consumers can turn in response to price increases and other existing or potential producer's ability to expand output." *Draper,* 735 F.2d at 423. In determining the relevant product market, a court must consider "all commodities which are reasonably interchangeable for the purposes for which they are produced" and thus serve as "available substitutes" for a given product. *Barwick,* 692 F.Supp. at 1344–45.

In *Du Pont,* the government argued that the defendant's own product (cellophane) constituted the relevant product market upon which defendant's alleged anti-competitive conduct should be judged. However, the Supreme Court rejected this argument, holding instead that cellophane's interchangeability with other materials made it part of the "flexible packaging material" market. *Id.* 351 U.S. at 400, 76 S.Ct. at 1010.

---

9. *Du Pont* involved an alleged violation of § 2 of the Sherman Act rather than § 1. However, the showing necessary under Section 2 to establish the existence of a relevant market is the same as that necessary under Section 1. *Barwick,* 692 F.Supp. at 1348 (failure to meet burden of showing relevant market under Section 1 warranted summary judgment on Section 2 claim as well).

■ Similarly, this Court believes that SBC is attempting to define the relevant product market in the present case too narrowly. The Court must consider all commodities that are "reasonably interchangeable" and thus available as substitutes for a given product in determining the relevant product market. *Barwick*, 692 F.Supp. at 1344–45. SBC has not produced sufficient evidence to permit a reasonable jury to conclude that the appropriate product market consists of only one model of copier (the Panasonic FP–C1) rather than that it consists of all full color copiers comparable in price and features to the FP–C1.[10] Given SBC's admission that "[n]umerous other manufacturers make and sell other, competitive, full color copiers," Pl.'s Resp. to Def.'s Stmnt. of Mat. Facts ¶ 4, this Court determines that SBC has not produced sufficient evidence to present a genuine issue of fact as to whether Panasonic's actions resulted in an injury to competition in general.

■ "[S]ince an antitrust plaintiff has the ultimate burden of proving the relevant product market, then such plaintiff also bears the burden, for summary judgment purposes, of pointing out the existence of genuine issues of material fact when the existence of its own defined product market is called into doubt." *Barwick*, 692 F.Supp. at 1345 n. 9. It is clear that Panasonic has called into doubt the existence of the relevant market defined by SBC. Br. in Supp. of Def.'s Mot. for Summ. J. at 14. SBC has not responded by meeting its burden of establishing a well-defined relevant geographic market in which Panasonic's alleged anti-competitive conduct might be judged. Moreover, SBC has failed to establish a genuine issue of material fact as to whether there was an injury to competition in general. Thus, summary judgment is appropriate on Plaintiff's Section 1 claim.

*b. Section 2 of the Sherman Antitrust Act*

■ Section 2 of the Sherman Act establishes two potential antitrust of-

fenses: monopolization and attempt to monopolize. *Ad–Vantage Tel. Dir. Consult. v. GTE Directories*, 849 F.2d 1336, 1341 (11th Cir.1987). SBC alleges that Panasonic either conspired with other dealers to control and monopolize the sale of FP–C1 copiers or conspired to attempt to control and monopolize such copiers. Compl. ¶ 41. To establish monopolization, a plaintiff must show both (1) possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Ad–Vantage Tel.*, 849 F.2d at 1341. To prove an attempt to monopolize, a plaintiff must demonstrate both (1) that the defendant had a specific intent to accomplish monopolization, and (2) that there existed a dangerous probability that the attempt would be successful. *Id.*

■ Summary judgment is appropriate for SBC's Section 2 claim for the same reason that it was appropriate for its Section 1 claim—SBC has failed to meet its burden regarding proof of the alleged relevant geographic market. In *Ad–Vantage Tel.*, the Eleventh Circuit observed that "[i]n this circuit a Section 2 plaintiff attempting to prove either completed monopolization or an attempt to monopolize must 'provide the jury with sufficient evidence to permit it to define the relevant geographic and product market.'" *Id.* (quoting *In re Municipal Bond Reporting Anti–Trust Litigation*, 672 F.2d 436, 441 (5th Cir. 1982)). As previously discussed, the showing necessary under Section 2 to establish the existence of a relevant market is the same as that necessary under Section 1. *Barwick*, 692 F.Supp. at 1348.

■ Moreover, even if SBC had established the existence of a relevant geographic market, the Court is not convinced that it has stated a valid claim under Section 2.

---

**10.** Interestingly, in the context of one of its antitrust claims under the Robinson–Patman Act (discussed *infra*), SBC appears to assert that the appropriate relevant product market is the "color copier market." Am.Compl. ¶ 54 (effect of Defendant's discrimination being to "substantially lessen the competition offered by Plaintiff in the color copier market").

SBC's argument is essentially that Panasonic has a monopoly on its own product—the FP–C1 color copier. In *Du Pont* the Supreme Court observed that:

> [e]very manufacturer is the sole producer of the particular commodity it makes but its control in the [Section 2] sense of the relevant market depends upon the availability of alternative commodities for buyers.... This interchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the competing commodities.

351 U.S. at 380–81, 76 S.Ct. at 999. The *Du Pont* Court went on to note that if the defendant's own product (cellophane) "is the 'market' that [defendant] is found to dominate, it may be assumed it does have monopoly power over that 'market.' " *Id.* at 391, 76 S.Ct. at 1005. However, the Court went on to hold that this "monopoly" over its own product did not constitute a violation of Section 2 as the defendant had no power to prevent competition from other similar products (*i.e.,* other wrapping materials such as aluminum foil). *Id.* at 392, 76 S.Ct. at 1005. Similarly, while it may be true that Panasonic necessarily has a "monopoly" over the FP–C1 copier, the presence in the market of a number of other similar models by other manufacturers leads this Court to believe that Plaintiff has not established a valid claim under Section 2 of the Sherman Act.

### c. *Robinson–Patman Act Claims*

SBC alleges two violations of the Robinson–Patman Act. In Count V, Plaintiff asserts that Panasonic's bid to DeKalb County was at a price so low that it was below the cost available at that time to SBC and other dealers. Plaintiff argues that the effect of such a low bid was to "substantially lessen the competition offered by [SBC] in the color copier market" in violation of 15 U.S.C. § 13(a). Pl.'s Am. Compl. ¶ 54.

■ Section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act, makes it unlawful "for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly." 15 U.S.C. § 13(a). The purpose of this section is "to insure that purchasers from a single seller would not be injured by the seller's discriminatory pricing policies." *DeLong Equip.,* 887 F.2d at 1516 n. 22. In order to establish a Section 2(a) violation in this circuit, a plaintiff must allege and prove that there were two actual sales at two different prices made by the same seller to at least two different purchasers.[11] *Id.* "To constitute a Robinson–Patman wrong, the price discrimination must occur between competitors in comparable transactions—*i.e.,* where persons receiving the different prices are in actual, functional competition with one another." *M.C. Manufacturing Co., Inc. v. Texas Foundries, Inc.,* 517 F.2d 1059, 1066 (5th Cir.1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976).[12] The Eleventh Circuit Court of Appeals has expressly held that

---

**11.** There appears to be a limited exception in this circuit to the requirement that two actual sales occur in order to constitute a Section 2(a) violation. *American Can Co. v. Bruce's Juices, Inc.,* 187 F.2d 919 (5th Cir.), *cert. dismissed,* 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 657 (1951), cited by Plaintiff, establishes that "where competitors in the same market are engaged in competitive purchasing and selling at the time of the price discrimination and where the failure of the plaintiff to consummate a second purchase of the item discriminatorily priced is directly attributable to defendant's own discriminatory practice," a second sale was not necessary. *M.C. Manufacturing Co., Inc. v. Texas Foundries,*

*Inc.,* 517 F.2d 1059, 1067 n. 17 (5th Cir.1975), *cert. denied,* 424 U.S. 968, 96 S.Ct. 1466, 47 L.Ed.2d 736 (1976). The Court concludes that the *Bruce's Juices* exception, applicable to cases involving competitive purchasers at the same level of distribution, is not applicable to the factual situation present in this case.

**12.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

"actual functional competition [between purchasers is] required as a predicate for a Robinson–Patman claim in this circuit." *National Distillers, Etc. v. Brad's Mach. Products,* 666 F.2d 492, 496 (11th Cir.1982).

■ Judged under this standard, it is clear that SBC has not even alleged a valid Section 2(a) claim. The two sales alleged to constitute discriminatory pricing are apparently the sales by Panasonic (1) to De-Kalb County through FirstCopy under NAP, and (2) to SBC as an authorized Panasonic dealer (as these are apparently the only actual sales that occurred). It is clear, however, that these two sales cannot result in price discrimination between "competitors in comparable transactions." There is no evidence that DeKalb County and SBC are in "actual functional competition" in the copier resale market as there is no evidence that DeKalb County resells copiers at all. Thus, Plaintiff has failed to establish one of the necessary predicates for a Robinson–Patman claim in this circuit.

Plaintiff attempts to sidestep the "competitive purchasers" requirement by asserting that FirstCopy should be considered the favored purchaser. Pl.'s Resp. to Def.'s Mot. for Summ. J. at 22. However, the evidence is uncontroverted in establishing that FirstCopy did not "purchase" the copiers, but rather Panasonic sold the copiers directly to DeKalb County with FirstCopy serving as commissioned agent and authorized service representative under NAP. Pl.'s Resp. to Def.'s Stmnt. of Mat. Facts ¶¶ 25, 26. Thus, SBC has failed even to allege a violation of Section 2(a) and summary judgment on this count is appropriate.

■ Count VI alleges a second violation of the Robinson–Patman Act. SBC claims that Panasonic discriminated against SBC by making a bid through a person or organization who, as a purchaser on the same footing as SBC, received price benefits and terms which were not available to all purchasers. Pl.'s Am.Compl. ¶ 60. SBC argues that such action is in violation of 15 U.S.C. § 13(e).[13]

Section 2(e) of the Clayton Act, as amended by the Robinson–Patman Act, prohibits a seller from favoring any purchaser of a commodity bought for resale by providing promotional services and facilities that are not accorded to all purchasers on proportionally equal terms. *Alterman Foods, Inc. v. F.T.C.,* 497 F.2d 993, 997 (5th Cir.1974). SBC's complaint speaks of "price benefits and terms," Pl.'s Am. Compl. ¶ 60, which are not covered by Section 2(e), while making no mention of what "services and facilities" Panasonic is alleged to have furnished.

More significantly, Section 2(e) does not apply to this case because the copiers were not purchased for resale as required by the plain language of the statute. *Sano Petroleum Corp. v. American Oil Co.,* 187 F.Supp. 345, 356 (E.D.N.Y.1960) (added service not within Section 2(e) because defendant did not buy product for resale). As previously discussed, there is no evidence that DeKalb County, the actual purchaser, intended to resell the copiers. FirstCopy, on the other hand, did not purchase the copiers. Because SBC again has not even alleged a violation of Section 2(e), summary judgment is appropriate on this count as well.

### 3. The State Law Claims

#### a. Breach of Contract

■ SBC claims that the parties entered into a binding contract on July 28, 1989 as a result of a letter, culminating a series of negotiations, sent by Defendant's Regional Manager, Larry Ingenito, to SBC's Art Kreps. Resp. of Pl. to Def.'s Mot. for Summ. J. at 30. Plaintiff asserts that the letter became a binding contract pursuant to Georgia law because the par-

---

**13.** This section provides:
 It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale ... by contracting to furnish or furnishing ... any services or facil-

ities connected with the ... handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.
 15 U.S.C. § 13(e).

ties treated and regarded it as a contract. *Id.* Plaintiff further alleges that Panasonic breached the July 28th contract by failing to place a billboard as promised, failing to provide timely, accurate direct mail literature concerning the FP–C1 copier, and failing to make promised placements in the Gwinnett Daily News. *Id.* at 31.

Even if this Court accepts as true that a valid contract existed as a result of the July 28th letter, summary judgment is still appropriate for Plaintiff's breach of contract claim. On August 7, 1989, shortly after the letter in question was written, the parties entered into an authorized dealer agreement. This agreement contained a merger clause, which provided:

> This Agreement sets forth the entire understanding, and hereby supersedes any and all prior agreements, oral or written, heretofore made, between the parties with respect to the subject matter of this agreement, and there are no representations, warranties, covenants, agreements or collateral understandings, oral or otherwise, expressed or implied, affecting this instrument that are not expressly set forth herein....

Ex. D to Def.'s Mot. for Summ. J. ¶ 20.1.

As the Eleventh Circuit Court of Appeals has observed, "a 'merger clause' is in reality merely a contractual reaffirmance of the parole evidence rule," which bars evidence of a previous or contemporaneous agreement that attempts to vary the terms of a contract. *Schlange–Schoeningen v. Parrish,* 767 F.2d 788, 792 (11th Cir.1985). The *Schlange* court noted the "longstanding and strong policy" in support of the parol evidence rule, as the rule puts both parties to a contract on notice as to the extent to which their bargains will be enforced. *Id.*

 In a diversity case such as the present one, our task is "merely to adjudicate the present controversy under Georgia law." *Id.* at 792 n. 1. Georgia law pro-

vides that when the parties to a contract "agreed that [the] written contract contained the entire agreement ..., any understanding not embodied in the writing is irrelevant." [14] *Quigley v. Jones,* 174 Ga. App. 787, 332 S.E.2d 7, *aff'd,* 255 Ga. 33, 334 S.E.2d 664 (1985). *See also Driscoll v. Schuttler,* 697 F.Supp. 1195, 1202 (N.D.Ga. 1988); *Goober v. Gulf Oil Corp.,* 574 F.Supp. 237, 239 (S.D.Ga.1983); *Kelson Cos. v. Feingold,* 168 Ga.App. 391, 393, 309 S.E.2d 394 (1983). Thus, even assuming that Plaintiff is correct regarding the legal effect of the July 28th letter, that agreement merged with the authorized dealer agreement when it was signed in August and the authorized dealer agreement became the entire agreement between the parties. Because Plaintiff admits that there has been no violation of the authorized dealer agreement, Resp. of Pl. to Def.'s Mot. for Summ. J. at 30, he has failed to state a valid claim for breach of contract and summary judgment is required on this count.

### b. Tortious Interference with Business Relations

In Count I, Plaintiff alleges that Defendant tortiously interfered with its business relationships in two ways. First, SBC argues that Panasonic's action in deliberately submitting a bid to DeKalb County at a price that it knew to be below SBC's cost was a willful and improper attempt to interfere with and destroy SBC's business relationship with DeKalb County and other area schools. Compl. ¶ 24. Second, Plaintiff claims that the deliberate withholding of information about NAP from SBC until after the DeKalb bidding constituted tortious interference with SBC's business relations. *Id.* ¶ 25.

 In order to establish a claim of tortious interference with business rela-

---

**14.** The only exception under Georgia law to the rule that merger clauses are given effect comes into play when promissory fraud is alleged. When a plaintiff shows that the other party to a contract represented a fact or made a promise as an inducement for contracting, the plaintiff may either rescind the contract and sue in tort for deceit or affirm the contract and sue on the contract for breach (but may not do both). *Schlange,* 767 F.2d at 792. As Plaintiff in the present case has not alleged promissory fraud and is clearly trying to sue on the contract for breach rather than rescinding the contract, this exception does not apply.

tions, a plaintiff must prove that the defendant (1) acted improperly and without privilege, (2) purposely, with malice, and with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) plaintiff suffered some financial injury as a result. *DeLong Equip. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1518 (11th Cir.1989). The claim of tortious interference with business relations is based on the generally recognized principle that "a person's business is property in the pursuit of which he is entitled to protection from tortious interferences by a third person." *Life Care Ambulance, Inc. v. Hospital Auth. of Gwinnett County*, 202 Ga.App. 864, 868, 415 S.E.2d 502 (1992).

The Georgia courts and federal courts applying Georgia law have apparently not completely defined the contours of the term "improper" in the context of tortious interference with business relations. However, this Court is convinced that Plaintiff has not produced sufficient evidence to create a genuine issue of fact as to whether Panasonic's actions in this case were "improper."

 The Court concludes that SBC's first allegation, that Panasonic deliberately submitted a low bid, does not constitute an improper action for two reasons. First, under Georgia law Panasonic had the right to sell to DeKalb County at any price it desired. " 'The policy of the common law has always been in favor of free competition ... In the absence of prohibition by statute, illegitimate means, or some other unlawful element, a defendant seeking to increase his own business may cut rates or prices, allow discounts or rebates, [or] enter into secret negotiations.' " *Parks v. Atlanta News Agency, Inc.*, 115 Ga.App. 842, 845, 156 S.E.2d 137 (1967) (quoting PROSSER ON TORTS 979 (3d ed.)); *see also DeLong Equip.*, 887 F.2d at 1519 (no tortious interference with business relations when manufacturer of product solicited customer that used its product). Secondly, Georgia law establishes that conduct is not improper for tortious interference purposes when the alleged tortfeasor is acting within

rights it reserved in an agreement between the parties. *Life Care Ambulance*, 202 Ga.App. at 868, 415 S.E.2d 502. In such a situation, legitimate exercise of rights reserved in a contract shows an absence of malicious intent. *Id.* In the present case, Panasonic expressly reserved the "unrestricted right to solicit and make direct sales of the Products to anyone, anywhere." Ex. D to Def.'s Mot. for Summ. J. ¶ 2. The Court does not believe that Panasonic's exercise of that reserved right constitutes tortious interference.

 Moreover, Panasonic's second alleged tortious act, deliberately withholding information about NAP from SBC, is not improper for the same reason—the contract reserved to Panasonic the right to sell its products directly without any obligation to inform SBC. In expressly reserving the right to make direct sales, the contract between the parties provides that such solicitation and sales could be made by Panasonic "without any obligation to [SBC] of any kind." *Id.* There is simply no evidence that Panasonic had any duty to inform SBC of the existence of NAP. Thus, failure to do so was not "improper" and did not constitute tortious interference. Because SBC has failed to make a showing sufficient to establish the existence of an element essential to its case on which it will bear the burden of proof at trial, summary judgment is appropriate on SBC's tortious interference claim. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

## C. CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has failed to establish that there is a genuine issue of material fact on any of its claims. Accordingly, Defendant's Motion for Summary Judgment [14–1] is GRANTED.

SO ORDERED.